# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN CHEMISTRY COUNCIL, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 1:23-cv-02113-JDB** |
| **v.** ) | |
| ) | |
| **NATIONAL ACADEMY OF SCIENCES,** ) | |
| *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

# FEDERAL DEFENDANTS' COMBINED MEMORANDUM
# IN SUPPORT OF MOTION TO DISMISS
# AND OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

I.     STATUTORY BACKGROUND.............................................................................. 3

II.    FACTUAL BACKGROUND .................................................................................. 5

      A.    EPA's Integrated Risk Information System ("IRIS")............................................ 5

      B.    IRIS Program's Formaldehyde Assessments ....................................................... 7

      C.    American Chemistry Council ............................................................................... 9

      D.    PROCEDURAL HISTORY................................................................................. 11

LEGAL STANDARD................................................................................................. 12

ARGUMENT ............................................................................................................. 13

I.     PLAINTIFF LACKS STANDING TO SUE FEDERAL DEFENDANTS..................... 13

      A.    Plaintiff's Alleged Informational Injury is Not Traceable to EPA And Cannot be Redressed by EPA. ............................................................................... 14

      B.    Plaintiff Lacks Organizational Standing to Sue Federal Defendants.................... 16

      C.    Plaintiff Lacks Associational Standing to Sue Federal Defendants...................... 19

II.    PLAINTIFF FAILS TO STATE A CLAIM AGAINST FEDERAL DEFENDANTS AS A MATTER OF LAW................................................................ 20

      A.    Plaintiff Fails to State a Claim that EPA "Managed or Controlled" the Committee............................................................................................................. 22

      B.    Plaintiff's APA Claim Against Federal Defendants Must Be Dismissed Because It Does Not Challenge Any Final Agency Action................................... 26

      C.    Plaintiff's Claim Against Federal Defendants Should be Dismissed because the United States has not Waived its Sovereign Immunity.................... 29

III.   PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED................................................................................................................ 30

      A.    Plaintiff's Claim Against Federal Defendants is Unlikely to Succeed on the Merits ............................................................................................................. 30

     B.     Plaintiff Will Not Suffer Imminent Irreparable Harm Absent Preliminary Relief........................................................................................................ 33

     C.     The Balance of Equities and Public Interest Do Not Support a Preliminary Injunction ...................................................................................... 35

IV.    LOCAL RULE 7(n) SHOULD BE WAIVED BECAUSE THE MOTION TO DISMISS CAN BE DECIDED WITHOUT AN ADMINISTRATIVE RECORD......... 37

CONCLUSION.................................................................................................... 38

# TABLE OF AUTHORITIES

**CASES**

*100Reporters v. U.S. Dept. of Justice*,
  248 F. Supp. 3d 115 (D.C. Cir. 2017)........................................................................ 25

*Adair v. England*,
  193 F. Supp. 2d 196 (D.D.C. 2002) .......................................................................... 21

*Akbar v. Cuccinelli*,
  No. 18-2808, 2020 WL 1287817 (D.D.C. Mar. 18, 2020) ........................................ 38

*Allied Chem. Corp. v. Daiflon, Inc.*,
  449 U.S. 33 (1980)................................................................................................... 21

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
  271 F.3d 262 (D.C. Cir. 2001) ................................................................................. 37

*Am. First Legal Found. v. Cardona*,
  630 F. Supp. 3d 170 (D.D.C. 2022) .......................................................................... 29

*Animal Legal Def. Fund, Inc. v. Shalala.*,
  104 F.3d 424 (D.C. Cir. 1997) ................................................................................... 4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................. 12

*Baptist Mem'l Hosp. v. Sebelius*,
  603 F.3d 57 (D.C. Cir. 2010) ................................................................................... 21

*Bennett v. Spear*,
  520 U.S. 154 (1977)................................................................................................. 27

*Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*,
  461 U.S. 273 (1983)................................................................................................. 29

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
  344 F. Supp. 3d 158 (D.D.C. 2018) .......................................................................... 35

*Cal. Forestry Ass'n v. U.S. Forest Serv.*,
  102 F.3d 609 (D.C. Cir. 1996) ................................................................................. 32

*Cal. Valley Miwok Tribe v. United States*,
  515 F.3d 1262 (D.C. Cir. 2008) ............................................................................... 21

*California v. Texas*,
  593 U.S. ——, 141 S. Ct. 2104 (2021)...................................................................... 13

*Cap. Hill Baptist Church v. Bowser,*
   496 F. Supp. 3d 284 (D.D.C. 2020) ........................................................................ 34

*Chem. Mfrs. Ass'n v. EPA,*
   28 F.3d 1259 (D.C. Cir. 1994) ...................................................................... 6, 28, 33

*Clapper v. Amnesty Int'l, USA,*
   568 U.S. 398 (2013) ...................................................................................... 17, 19, 34

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,*
   452 F.3d 798 (D.C. Cir. 2006) ............................................................................ 26, 27

*Ctr. for Biological Diversity v. Tidwell,*
   239 F. Supp. 3d 213 (D.D.C. 2017) ........................................................................ 26

*Ctr. for L. & Educ. v. Dep't of Educ.,*
   396 F.3d 1152 (D.C. Cir. 2005) .............................................................................. 17

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ................................................................................................ 13

*Davis v. Pension Benefit Guar. Corp.,*
   571 F.3d 1288 (D.C. Cir. 2009) .............................................................................. 13

*Dep't of Educ. v. Brown,*
   600 U.S. 551 (2023) ................................................................................................ 15

*Desai v. U.S. Citizenship & Immigr. Servs.,*
   No. 20-1005, 2021 WL 1110737 (D.D.C. Mar. 22, 2021) ...................................... 38

*Equal Rts. Ctr. v. Post Props., Inc.,*
   633 F.3d 1136 (D.C. Cir. 2011) .............................................................................. 16

*Fed. Election Comm'n v. Akins,*
   524 U.S. 11 (1998) .................................................................................................. 14

*Food & Water Watch, Inc. v. Vilsack,*
   808 F.3d 905 (D.C. Cir. 2015) ................................................................................ 18

*Food Chem. News v. Young,*
   900 F.2d 328 (D.C. Cir. 1990) ................................................................................ 22

*Friends of Animals v. Jewell,*
   828 F.3d 989 (D.C. Cir. 2016) ................................................................................ 14

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ................................................................................................ 16

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ................................................................................................ 19

*Judicial Watch, Inc. v. Nat'l Energy Dev. Policy Grp.,*
  219 F. Supp. 2d 20 (D.D.C. 2002) ..................................................................... 26, 35

*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray,*
  424 F. Supp. 3d 26 (D.D.C. 2020), *aff'd,* 848 F. App'x 528 (D.C. Cir. 2021) ........ 18

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) .................................................................................... 34

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................... 13, 15, 17

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ................................................................................................ 26

*Metcalf v. Nat'l Petroleum Council,*
  553 F.2d 176 (D.C. Cir. 1977) ............................................................................... 20

*Mukkavilli v. Jaddou,*
  No. 22-cv-2289, 2023 WL 4029344 (D.D.C. June 15, 2023) ................................. 38

*N. States Power Co. v. U.S. Dep't of Energy,*
  128 F.3d 754 (D.C. Cir. 1997) ............................................................................... 21

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr,*
  496 F. Supp. 3d 116 (D.D.C. 2020) ....................................................................... 14

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr,*
  No. 20-1132, 2020 WL 6392777 (D.D.C. Nov. 20, 2020) ...................................... 32

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Res. Syst.,*
  773 F. Supp. 2d 151 (D.D.C. 2011) ....................................................................... 35

*Nat'l Res. Def. Council v. Abraham,*
  223 F. Supp. 2d 162 (D.D.C. 2002), *order set aside in part on other grounds,*
  353 F.3d 40 (D.C. Cir. 2004) ........................................................................... 20, 21

*Natural Resources Defense Council v. Pena,*
  147 F.3d 1012 (D.C. Cir. 1998) ....................................................................... *passim*

*Nken v. Holder,*
  556 U.S. 418 (2009) ......................................................................................... 12, 36

*Nohria v. Renaud,*
  No. 20-cv-2085, 2021 WL 950511 (D.D.C. Mar. 14, 2021) ................................... 38

*Pa. Higher Educ. Assistance Agency v. Perez*,
  457 F. Supp. 3d 112 (D. Conn. 2020) ....................................................... 29

*Patterson v. Haaland*,
  No. 1:21-cv-02391, 2022 WL 4534685 (D.D.C. Sept. 28, 2022) ....................... 38

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ............................................................. 17

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*,
  810 F.3d 827 (D.C. Cir. 2016) ............................................................... 20

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
  35 F.4th 1225 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1000 (2023) ............... 23

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003) ............................................................... 27

*Scenic America, Inc. v. U.S. Department of Transportation*,
  983 F. Supp. 2d 170 (D.D.C. 2013) ......................................................... 18

*Schilling v. Rogers*,
  363 U.S. 666 (1960) ........................................................................... 29

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ............................................................... 12

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ........................................................................... 17

*Spann v. Colonial Vill., Inc.*,
  899 F.2d 24 (D.C. Cir. 1990) ................................................................ 16

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................... 13

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  540 F. Supp. 3d 45 (D.D.C. 2021) .......................................................... 35

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................ 15

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ........................................................................... 13

*Town of Chester. v. Laroe Est., Inc.*,
  581 U.S. 433 (2017) ........................................................................... 13

*Two Shields v. Wilkinson*,
  790 F.3d 791 (8th Cir. 2015) ................................................................................. 29

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
  231 F.3d 20 (D.C. Cir. 2000) ................................................................................ 12

*Vanover v. Hantman*,
  77 F. Supp. 2d 91 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002) ................................ 12

*Walpin v. Corp. for Nat'l & Cmty. Serv.*,
  718 F. Supp. 2d 18 (D.D.C. 2010) ......................................................................... 29

*Wash. Legal Found. v. U.S. Sentencing Comm'n*,
  17 F.3d 1446 (D.C. Cir. 1994) ................................................................. 22, 23, 25

*White v. Univ. of Cal.*,
  765 F.3d 1010 (9th Cir. 2014) ............................................................................. 29

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ............................................................................... 17, 19

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................. 12, 35

*Xia v. Tillerson*,
  865 F.3d 643 (D.C. Cir. 2017) ............................................................................ 12

**STATUTES**

5 U.S.C. § 702 ........................................................................................... 29

5 U.S.C. § 704 ........................................................................................... 26

5 U.S.C. § 706 ...................................................................................... 2, 11

5 U.S.C. §§ 1001 *et seq.* ................................................................................. 3

5 U.S.C. § 1001 ........................................................................................... 4

5 U.S.C. § 1014 .................................................................................... *passim*

28 U.S.C. § 1361 ......................................................................................... 11

Federal Advisory Committee Act,
  Pub. L. No. 92-463, 86 Stat. 770 (1972) ................................................................... 3

**FEDERAL RULES**

Fed. R. Civ. P. 12 ....................................................................................... 12

**LOCAL RULES**

LCvR 7 ........................................................................................................................ 37

Comment to Local Rule 7 ......................................................................................... 37

**REGULATIONS**

Integrated Risk Information System (IRIS); Health Risk Assessment Guidelines, etc.,
53 Fed. Reg. 20,162 (June 2, 1988) ..................................................................... 6

Federal Advisory Committee Management,
66 Fed. Reg. 37,728 (July 19, 2001) .................................................................... 24

41 C.F.R. Part 102-3, subp. E, App. A……………………………………………..24

**OTHER AUTHORITIES**

143 Cong. Rec. 25,842-45 (1997) ........................................................................ 4, 30

EPA, *Basic Information about the Integrated Risk Information System*,
https://www.epa.gov/iris/basic-information-about-integrated-risk-information-
system#process ............................................................................................. 5, 6, 34

EPA, Peer Review Handbook (4th Ed.),
*https://www.epa.gov/sites/default/files/202008/documents/epa_peer_review_*
*handbook_4th_edition.pdf* ............................................................................... 24

IRIS Process for Developing Human Health Assessments,
https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system
#process......................................................................................................... 28

Kurtis A. Kemper, *Construction and application of Federal Advisory Committee Act*,
160 A.L.R. Fed. 483 (2000) .............................................................................. 3

Letter from Dr. Lynn Dekleva, to Michael Regan (Mar. 10, 2022),
https://www.americanchemistry.com/industry-groups/formaldehyde/resources/
formaldehyde-panel-follow-up-letter-to-epa ................................................... 10

NAS, *About the NAS, Organization*,
https://www.nasonline.org/about-nas/organization/. ........................................ 4

NAS, Review of EPA's 2022 Draft Formaldehyde Assessment (2023),
https://nap.nationalacademies.org/catalog/27153/review-of-epas-2022-draft-
formaldehyde-assessment ......................................................................... 1, 7, 8, 33

## INTRODUCTION

Plaintiff American Chemistry Council ("ACC") is a trade association that has engaged in a years-long campaign to disrupt the U.S. Environmental Protection Agency's ("EPA") efforts to assess the health risks associated with formaldehyde. Because formaldehyde is a ubiquitous hazardous air pollutant of environmental concern, EPA has spent over a decade performing an assessment of its toxicity values through the agency's Integrated Risk Information System (the "IRIS Program"), and that process is still underway.

Through this lawsuit, ACC attempts to stymie the EPA's ongoing IRIS assessment process by lodging procedural complaints about an independent peer review of EPA's draft formaldehyde assessment. Specifically, Plaintiff takes issue with an independent committee that was convened by the National Academy of Sciences ("NAS") pursuant to a September 2021 contract. Formation of the NAS committee and its scope of work were publicly-disclosed from the outset, as were many other aspects of the NAS peer review process. The NAS Committee completed its work and released its report on August 9, 2023. *See* NAS, Review of EPA's 2022 Draft Formaldehyde Assessment (2023), attached hereto as Ex. 1 (the "NAS Report").[1]

Plaintiff asks the Court to enjoin EPA from using or relying on the NAS Report based on its claims that the NAS Committee violated the Federal Advisory Committee Act, 5 U.SC. § 1014 ("FACA"), in various ways. Pursuant to FACA, a committee created by NAS must meet certain procedural requirements that are designed to provide transparency about the advisors and procedures used for producing advice to the government. *Id.* Because the committee at issue was

---

[1] The NAS Report also is available at https://nap.nationalacademies.org/catalog/27153/review-of-epas-2022-draft-formaldehyde-assessment. Plaintiff attached only a prepublication copy of the report to its briefing. *See* Pl.'s Mem. in Supp. of Mot. for Prel. or Permanent Injunctive Relief, ECF No. 17-1 ("Pl.'s Mem."), Ex. A.

created and run by NAS, which is a private corporation, Plaintiff does not—and cannot—allege that EPA and its Administrator ("Federal Defendants") committed any independent FACA violation. Rather, Plaintiff's only cause of action against Federal Defendants is that EPA's reliance on the NAS Report—which the Complaint does not allege has happened and is instead aimed at preventing—would be unlawful under FACA and the Administrative Procedure Act, 5 U.S.C. § 706 (the "APA").

This claim fails as a matter of law, on multiple grounds. As a threshold matter, Plaintiff lacks standing to sue Federal Defendants. It has not alleged any informational injury that is traceable to EPA or that can be redressed by EPA. Rather, it was NAS that created the committee, instituted its protocols, and conducted the peer review at issue. Nor has Plaintiff alleged any facts that could establish organizational or associational standing to sue Federal Defendants. Plaintiff fails to identify a single action that EPA has taken based on the NAS Report, much less an action that has harmed its organizational interests or its members in a concrete and imminent way.

Plaintiff also fails to state a claim against Federal Defendants under the APA. Nothing in the Complaint comes close to suggesting that EPA "managed or controlled" the NAS Committee. On the contrary, the allegations in the Complaint only confirm that the NAS Committee operated with the requisite independence contemplated by FACA. And Plaintiff has failed to challenge any event that could be deemed final agency action and thus subject to APA review. Indeed, Plaintiff does not allege that EPA has relied on the NAS Report and even if it did, that would merely be an interlocutory step in a multi-step IRIS assessment process.

Even if Plaintiff's claims against Federal Defendants could proceed, Plaintiff's Motion for Preliminary Injunction should be denied. Not only is Plaintiff unlikely to succeed on the merits of its claim against Federal Defendants for the reasons discussed above, but Plaintiff also has failed

to establish that the only form of relief it seeks against Federal Defendants—"a use injunction"—is justified. And Plaintiff also has failed to demonstrate that it will suffer irreparable harm absent preliminary relief or that the balance of equities tilts in its favor. Under these circumstances, Plaintiff should not be permitted to use FACA as a backdoor to delay EPA's important ongoing work.

Accordingly, Plaintiff's claims against Federal Defendants should be dismissed. In the alternative, Plaintiff's motion for preliminary injunction should be denied.

## BACKGROUND

## I.   STATUTORY BACKGROUND

FACA was enacted in 1972 to govern the operation of federal advisory committees and set requirements for public involvement through access to certain meetings and reporting requirements. Federal Advisory Committee Act, Pub. L. No. 92-463, 86 Stat. 770 (1972), 5 U.S.C. §§ 1001, *et seq*; *see also* Kurtis A. Kemper, *Construction and application of Federal Advisory Committee Act*, 160 A.L.R. Fed. 483 (2000). The purpose of the Act is "to reduce wasteful expenditure on advisory committees and to make advisory committees established by the executive branch of government more accountable to the public" by providing standards for the establishment, operation, termination, and control of advisory committees. *Id.* FACA imposes a number of requirements on advisory committees including fair balance of members, filing of committee charters, notice and publication of meetings in the Federal Register, public access to meetings and records, monitoring of meetings by federal officials, and limited committee duration. 5 U.S.C. §§ 1001, *et seq*.

For the first twenty-five years after FACA's enactment, the Act's requirements for federal advisory committees were not applied to the National Academy of Sciences. This was because

3

NAS is a private, independent organization of scientists and academics, which was chartered by Congress in 1863 to investigate, examine, experiment, and report upon issues related to science and technology. *See* NAS, *About the NAS, Organization* https://www.nasonline.org/about-nas/organization/. In 1997, however, the D.C. Circuit held that committees established by NAS to provide advice for federal agencies could be deemed federal advisory committees subject to FACA because, although NAS is organized as a private corporation, it was created by Congress. *See Animal Legal Def. Fund, Inc. v. Shalala*, 104 F.3d 424 (D.C. Cir. 1997). In response, Congress added Section 15 of the Act through the FACA Amendments of 1997 in order to "clarify public disclosure requirements that are applicable to the National Academy of Sciences." 143 Cong. Rec. 25,842 (1997) (statement of Rep. Stephen Horn).

As amended, FACA excludes NAS from the Act's definition of "advisory committee" and exempts NAS committees from the general requirements that apply to federal advisory committees. 5 U.S.C. § 1001(2)(B)(ii). At the same time, Congress added a provision to FACA setting forth separate requirements for NAS committees when they are created under an agreement with a federal agency. 5 U.S.C. § 1014 (the "NAS provision"). The purpose of the NAS provision is to serve "the public's right to know about the advisors and procedures used to produce technical or policy advice for the government." 143 Cong. Rec. 25,845 (1997) (statement of Rep. Henry Waxman). FACA's NAS provision is titled "Requirements relating to National Academy of Sciences and National Academy of Public Administration" and states that:

> (a) An agency may not use any advice or recommendation provided by the National Academy of Sciences or National Academy of Public Administration that was developed by use of a committee created by that academy under an agreement with an agency, unless—
>
>> (1) the committee was not subject to any actual management or control by an agency or an officer of the Federal Government;

4

> > (2) . . . the membership of the committee was appointed in accordance with the requirements [for public notice regarding appointees] described in subsection (b)(1); and
>
> > (3) in developing the advice or recommendation, the academy complied with [the public notice and information sharing requirements in subsection (b)(2) through (6)].

5 U.S.C. § 1014. Subsection (b) of FACA's NAS provision lays out requirements that NAS must satisfy when it convenes a committee to advise a federal agency. Those requirements include: public notice and opportunity for the public to comment on the appointment of committee members, *id.* § 1014(b)(1); public notice and document-sharing requirements for certain types of committee meetings, *id.* § 1014(b)(2)-(4); public disclosure of the committee's final report, *id.* § 1014(b)(5); and public disclosure of the report's principal reviewers after its publication, *id.* § 1014(b)(6).

## II.   FACTUAL BACKGROUND

### A.   EPA's Integrated Risk Information System ("IRIS")

EPA's mission is to protect human health and the environment. EPA's Integrated Risk Information System Program (the "IRIS Program") supports the Agency's mission by identifying and characterizing the health hazards of chemicals found in the environment. *See* EPA, *Basic Information about the Integrated Risk Information System*, https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system#process (hereinafter "EPA, *Basic Information about IRIS*"). The IRIS Program is located within EPA's Center for Public Health and Environmental Assessment (CPHEA) in the Office of Research and Development (ORD). *Id.* The IRIS program develops human health assessments that evaluate potential health effects that may result from exposure to environmental contaminants. *Id.* Among other things, this includes

scientific reviews that lead to the development of reference concentrations (RfCs) for noncancer outcomes and inhalation unit risk (IUR) values for cancer outcomes for inhaled chemicals. *Id.*

When developing human health assessments, the IRIS Program employs a seven-step process: (1) EPA develops an initial draft assessment; (2) scientists in EPA's program offices and regions review the draft assessment; (3) other federal agencies and the Executive Office of the President review the draft assessment; (4) after revising based on agency and interagency comments, a draft assessment and charge questions are released for public comment (4a) and external peer review (4b); (5) the draft assessment is revised to address public comments and peer review recommendations; (6) the revised draft assessment is reviewed by EPA's program offices and other federal agencies, including the Executive Office of the President; and (7) the final IRIS assessment is posted to the IRIS website. *Id.*; *see also* Pl.'s Mem. at 2 n.3 & 4 n.7.

IRIS assessments and the scientific information in them do not themselves establish any enforceable standards or limits, and do not create or trigger any legal requirements. *See Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1263 (D.C. Cir. 1994) ("The [IRIS] database by itself has no preclusive effect; the data in the database constrain no one until so applied in a particular rule."). Instead, IRIS assessments are a publicly-accessible source of information that "serv[e as a] guide[] in evaluating potential health hazards and selecting a response to alleviate a potential risk to human health." Integrated Risk Information System (IRIS); Health Risk Assessment Guidelines, etc., 53 Fed. Reg. 20162, 20,163 (June 2, 1988). Among other things, IRIS assessments may (or may not) be used as scientific support for the development of health risk assessments, which in turn may (or may not) inform federal risk management decisions such as those contained in agency rulemaking.

B. <u>IRIS Program's Formaldehyde Assessments</u>

In 1989, the IRIS Program listed formaldehyde as a probable human carcinogen and provided a cancer unit risk estimate (URE), followed by a noncancer reference dose (RfD) the following year. NAS Report at 1. In 2010, EPA updated its draft IRIS assessment of formaldehyde, and asked NAS to conduct an independent peer review. *Id.* NAS convened a committee to conduct a peer review of the 2010 draft assessment and released a NAS peer review report in 2011, finding "numerous specific and general problems with EPA's 2010 Draft [IRIS] Assessment." NAS Report at 14 (summarizing the 2011 report).  EPA worked to address the feedback raised in NAS's report, convening a workshop in 2014 and completing a revised draft assessment in 2017. *Id.* EPA further updated the draft IRIS assessment beginning in 2021 and then released it in April 2022 as the 2022 *Draft IRIS Toxicological Review of Formaldehyde: Inhalation* (the "Draft IRIS Assessment").

In September 2021, EPA executed a Task Order with NAS to conduct a second independent peer review of the 2022 Draft IRIS Assessment. Task Order #68HERC21F0401 under NAS Contract #68HERC19D0011 (Sept. 7, 2021) ("Task Order"), attached to Pl.'s Mem. as Ex. C. The Task Order states that NAS will form a committee of subject matter experts to provide an external peer review of EPA's draft document. *Id.* at 1. The contract also states that NAS will "establish an expert panel of up to 12 experts following [NAS's] procedures on committee composition, balance, and conflict of interest" and that "NAS shall take public nominations for panel members and solicit comments on the panel." *Id.* at 2.

The Task Order also defined the scope of the NAS committee's task with respect to its review of the 2022 Draft IRIS Assessment in accordance with standard practice for external peer review. *Id.* It makes clear that the task at hand was to provide an independent peer review of the

draft IRIS assessment, but not to have the committee develop its own independent assessment. Of particular relevance here, it provides:

> The NAS expert peer review committee shall evaluate the assessment's conclusions using the charge questions set forth by EPA and shall not conduct an independent assessment separately from the IRIS document nor shall the NAS comment on the broader aspects of the IRIS program. Comments provided by the NAS committee shall be limited to responding to the materials provided by the EPA.

*Id*.

NAS began the process of conducting the independent peer review in April 2022 upon release of the draft assessment. Pursuant to its contract with EPA, NAS convened a committee of experts in accordance with its standard procedures. This included soliciting nominations and then posting a provisional list of the committee members on August 5, 2022, and soliciting public comments on that provisional membership during the 20-calendar days after it was released. *See* Pl.'s Mem., Exs. S & L. The selected NAS Committee held nine meetings related to the Draft IRIS Assessment, including three open sessions with public comment periods. NAS Report at 16-17 (describing open sessions); *see also id.*, Appx. B (providing agendas for the open sessions, list of public commentors, and links to presentations, recordings, and documents provided by EPA that were reviewed by the committee). More than forty commentors provided oral input at the open meetings. *Id.* In addition to the opportunities for comment at these open meetings, stakeholders were encouraged to "submit written comments or other materials relevant to the committee's charge at any time during the course of the study." *Id.* at 17.

On August 9, 2023, the NAS Committee released its peer review report. *See* NAS Report. The Committee found that "[t]he assessment has been revised and improved substantially" since the 2010 version and that "its findings on hazard and quantitative risk are supported by the

scientific evidence identified." *Id.* at xii. The NAS Report explains that "[o]verall, the committee found that the methods used for the assessment were appropriate and reflect EPA's current practices in some components of the IRIS process," but that "there are opportunities to strengthen and clarify the 2022 Draft Assessment." *Id.* at xi. As is standard for such complex assessments, the NAS Committee offered numerous recommendations to improve the assessment, including structural changes to provide greater "clarity as to the methods used and to facilitate their consideration by readers," a well as recommendations "to strengthen or clarify the scientific concepts, issues, or narrative in the assessment." *Id.*

The NAS Report also explains that its peer review was conducted based on the charge set forth in its Task Order, explaining that its "Statement of Task" was to "assess whether EPA's draft document adequately and transparently evaluated the scientific literature, used appropriate methods to synthesize the current state-of-the science, and presented conclusions regarding the hazard identification analysis and dose-response analysis of formaldehyde that are supported by the scientific evidence." *Id.* at 4. The NAS Report makes explicit that, consistent with the Task Order, "[t]he committee [did] not conduct its own hazard assessment of formaldehyde, nor [did] the committee address the broader aspects of the IRIS Program," *id.*, or "recommend alternative toxicity values." *Id.* at xi.

C.  <u>American Chemistry Council</u>

Plaintiff American Chemistry Council is a trade association that represents chemical manufacturers, including some members that produce, supply, and use formaldehyde. First Am. Compl. ¶¶ 14-15, ECF No. 15 ("Compl."). ACC alleges that, in anticipation of EPA's revised IRIS Assessment, it has launched and funded over fifty publications on various formaldehyde-related topics since 2010. *Id.* ¶ 16. ACC then shared the publications that it commissioned and

funded with EPA's IRIS staff, *id.* ¶ 46, including by sending EPA a web link to those materials, *id.* ¶ 47 n.21. ACC also submitted a letter to EPA on March 10, 2022, providing the trade association's views on how the agency should revise its IRIS Assessment, as well as its views on how EPA should structure its peer review contract with NAS. *See* Compl. ¶ 21 (citing Letter from Dr. Lynn Dekleva, to Michael Regan (Mar. 10, 2022) ("March 10 Letter"), https://www.americanchemistry.com/industry-groups/formaldehyde/resources/formaldehyde-panel-follow-up-letter-to-epa). ACC's March 10 letter to EPA pressed its view that both EPA and NAS should give greater focus to ACC's commissioned publications—rather than EPA's scientific methodology—and urged EPA to conclude that the biological risks associated with formaldehyde have been overblown. March 10 Letter at 4-5. And, on April 13, 2022, ACC sent a letter to EPA expressing dissatisfaction with the "Charge Questions and Committee Task" that EPA had prepared for NAS's peer review of the Draft IRIS Assessment, urging EPA to use a "series of overarching and detailed charge questions" drafted by ACC instead.  Compl. ¶ 55 n.26.

ACC also provided information and comments to NAS during the course of its peer review process. Compl. ¶ 17. For example, in addition to participating in the NAS committee's open sessions and providing comments to the committee in the ordinary course, ACC sent a letter to NAS on August 25, 2022, setting forth its concerns about the makeup of the NAS Committee, including ACC's view that the committee is not fairly balanced and is subject to conflicts of interest. Pl's. Mem., Ex. F. ACC's counsel also sent a letter to NAS on April 20, 2023, detailing ACC's various complaints about nearly every step of the NAS committee's performance. Pl.'s Mem., Ex. I. ACC's communications were not ignored. For example, when ACC sought additional information about NAS's information gathering sessions, NAS responded in order to clarify the reasons for its process. Pl.'s Mem., Ex. R (Mar. 6, 2023 letter). And on May 4, 2023, NAS

confirmed by letter to ACC's counsel that both their April 20 letter summarizing all of ACC's complaints about the NAS committee, as well as "ACC's previously expressed comments, have been shared with staff and the Committee in accordance with standard procedure." Pl.'s Mem., Ex. J.

D. <u>Procedural History</u>

Plaintiff initiated this lawsuit on July 20, 2023, ECF No. 1, and amended its Complaint on September 15, 2023, Am. Compl., ECF No. 15 ("Complaint" or "Compl.").[2] The Complaint asserts claims against NAS pursuant to the Mandamus Act, 28 U.S.C. § 1361, for various alleged violations of FACA (Counts I-VI). It asserts claims against Federal Defendants pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, alleging that it would be "unlawful, arbitrary, and capricious" for Federal Defendants to rely on the NAS Report under FACA (Count VII). The Complaint also seeks declaratory judgement against all Defendants (Count VIII). The prayer for relief asks the Court to "[d]irect and enjoin NASEM to include on all copies of the Report . . . a disclaimer" regarding FACA violations and to "[p]ermanently enjoin EPA from accepting, publishing, using, or relying upon the Report or any conclusions or recommendations produced by the existing Committee." Compl. at 54, Prayer for Relief (c), (e).

On October 13, 2023, before Defendants responded to the Complaint, Plaintiff filed a Motion for Preliminary Injunction. ECF 17. The parties filed a joint motion seeking to combine briefing on the motion for preliminary injunction with briefing on Defendants' anticipated motions to dismiss, ECF 18, which the Court granted.

---

[2] All references to the "Complaint" or "Compl." in this memorandum refer to the operative First Amended Complaint unless otherwise indicated.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Xia v. Tillerson*, 865 F.3d 643, 649–50 (D.C. Cir. 2017) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Under Federal Rule of Civil Procedure 12(b)(1), a plaintiff seeking to invoke the jurisdiction of a federal court bears the burden of establishing that the court has jurisdiction to hear its claims. *See U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000). When a defendant argues that the facts alleged in the complaint are insufficient to confer jurisdiction upon the court, the court applies substantially the same standard of review that is used to evaluate Federal Rule of Civil Procedure 12(b)(6) motions. *See Vanover v. Hantman,* 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002).

"A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The movant must establish: "(1) that it [is] likely to succeed on the merits; (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in [its] favor; and (4) that an injunction is in the public interest." *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20). The third and fourth factors merge when the government is the party opposing the motion. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "When seeking a preliminary injunction, the

movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

<u>**ARGUMENT**</u>

## I.    PLAINTIFF LACKS STANDING TO SUE FEDERAL DEFENDANTS

As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)—namely, that it has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The injury element of constitutional standing requires the plaintiff to show that the injury is "'concrete and particularized' and 'actual or imminent.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 560). Causation and redressability require a showing that the injury is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *California v. Texas*, 593 U.S. ——, 141 S. Ct. 2104, 2113–14 (2021) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)). Because "standing is not dispensed in gross," "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester. v. Laroe Est., Inc.*, 581 U.S. 433, 439 (2017) (citation omitted).

Plaintiff asserts three theories of standing, all of which fail as to its claims against Federal Defendants: (1) Plaintiff has not asserted any "informational injury" that is traceable to or redressable by EPA; (2) Plaintiff lacks organizational standing; and (3) Plaintiff cannot establish associational standing. Accordingly, this Court lacks jurisdiction over Plaintiff's claim against Federal Defendants, and they should be dismissed.

A.  Plaintiff's Alleged Informational Injury is Not Traceable to EPA And Cannot be Redressed by EPA

Plaintiff claims that "ACC and its members have suffered informational injuries from the unlawful actions of *the Committee*," specifically that they "have been denied access to information FACA requires *the Committee* to publish" and "also have been denied the opportunity to present information to *the Committee*."  Pl.'s Mem. at 17 (emphasis added). Courts have recognized that a committee's refusal to provide information covered by FACA may constitute informational injury sufficient to establish standing. *See NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 496 F. Supp. 3d 116, 128 (D.D.C. 2020). But Plaintiff cites no precedent for the novel theory that it has standing to sue a third party (*i.e.,* the EPA) based on an independent, private committee's actions, and indeed there is none. This is because, even if Plaintiff could establish that the Committee had "deprived [ACC and its members] of information" that it was required to disclose, *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016),[3] any informational injury must meet the traceability and redressability prongs of the traditional standing analysis. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998). Plaintiff cannot meet those requirements as to Federal Defendants.

First, Plaintiff's allegations of "informational" and "representational" injury are not traceable to Federal Defendants. Pl.'s Mem. at 17. As Plaintiff recognizes, NAS is a private, nongovernmental institution, Compl. ¶ 30, and it was NAS that created the Committee, instituted

---

[3] Federal Defendants do not agree and in no way concede that NAS violated FACA in any way, much less that Plaintiff suffered informational injury as a result of NAS's actions. Because NAS is an independent entity, Federal Defendants are not in a position to speak to NAS's actions or to lodge NAS's defense in this case. But Federal Defendants reserve the right to argue that the NAS Committee fully complied with FACA, in the event it were to become relevant or necessary to Federal Defendants' defense.

its protocols, and conducted the peer review at issue. *Id.* ¶¶ 46-60; *see also* Task Order at 3 (describing the NAS Committee's task as an "independent external peer review"); *id.* at 1 (stating that NAS will form a committee of expert reviewers and "*independently* vet [] experts for conflicts of interests and a lack of impartiality.") (emphasis added). Because the committee performed the peer review under the auspices of NAS—not EPA—any informational injury is not traceable to EPA. *See Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (plaintiff must show injury is "'fairly traceable to the challenged action *of the defendant*,' meaning that 'there must be a causal connection between the injury and the conduct complained of.'") (quoting *Lujan*, 504 U.S. at 560) (emphasis added).[4]

Second, any informational or representational injury suffered by Plaintiff could not be redressed by injunctive relief against the Federal Defendants—*i.e.*, "enjoining EPA from accepting, publishing, using, or relying upon the Report." Compl., Prayer for Relief (e). An injunction preventing EPA from using the report would not provide ACC access to the information it sought from the NAS Committee, nor would it change the makeup of NAS's committee. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 107 (1998).

Indeed, a similar attempt to bootstrap standing was rejected in *Natural Resources Defense Council v. Pena*, 147 F.3d 1012, 1014 (D.C. Cir. 1998). There, the D.C. Circuit reversed an injunction prohibiting the Department of Energy from using a report prepared by a committee,

---

[4] To the extent Plaintiff may suggest that EPA is vicariously liable for the NAS Committee's actions because it exercised "management or control" over the committee, Plaintiff has not alleged any facts that could support that conclusion. *See infra* in Part II.A (explaining why Plaintiff's claims that EPA "controlled" the committee fail as a matter of law).

where the committee had violated FACA by denying access to past committee meetings and documents. Because the injunction would not give the appellees access to documents and future meetings, the Court held that the redressability element was not satisfied. *Id.* at 1022. As the Court explained, the fact "[t]hat the appellees may have sustained a continuing injury by virtue of the Department's ongoing denial of FACA access to Committee documents and records cannot support their standing to sue for an injunction that does not itself address the access issue." *Id*. Similarly, here the injunction sought against Federal Defendants would not provide Plaintiff representation on the NAS Committee or access to its information about the NAS Committee's review.

      B.  <u>Plaintiff Lacks Organizational Standing to Sue Federal Defendants</u>

Plaintiff argues that ACC has organizational standing because it expended resources "to try to address EPA and NAS's failures during the assessment and review process." Pl.'s Mem. at 16. To establish organizational standing, ACC is required "like an individual plaintiff, to show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). To determine whether an organization's injury is "concrete and demonstrable" the court asks (1) whether the agency's action "injured the [organization's] interest"; and (2) whether the organization "used its resources to counteract that harm." *Equal Rights Ctr.*, 633 F.3d at 1140. Plaintiff has failed to establish a basis for organizational standing to sue Federal Defendants at either step.

First, Plaintiff has not identified any agency action that harmed its organizational interests, which it characterizes as a "mission to advocate for sound policymaking and scientific integrity in

the innovation and manufacture of chemical products." Pl.'s Mem. at 15. ACC argues only that "EPA's *planned use* of [the NAS Report is] inconsistent with ACC's objective to promote public policy that is supported by sound science, and ACC's efforts to enhance innovation and create jobs in the chemical industry." *Id.* (emphasis added). In other words, Plaintiff does not identify any action that EPA has actually taken, much less an agency action that has injured ACC's organizational interests in a concrete way. Instead, Plaintiff makes assumptions about what EPA will do in the future, and then makes the speculative leap that this hypothetical future action will affect the chemical industry in some unknown way. These layers of conjecture are plainly insufficient to establish standing. *See Lujan*, 504 U.S. at 560 (injury must be "concrete and particularized and actual or imminent, not conjectural or hypothetical" (citations omitted)); *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013) ("'[A]llegations of *possible* future injury are not sufficient." (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Second, Plaintiff does not identify any diversion of resources that qualifies to confer organizational standing.  Plaintiff alleges only that ACC commissioned formaldehyde studies to share with EPA and NAS, and then drafted letters lobbying EPA and NAS to change its review process and/or to credit ACC's preferred source materials. Pl.'s Mem. at 16. It is well-settled that these types of advocacy activities are insufficient to confer organizational standing. The D.C. Circuit has repeatedly held that an organization cannot establish standing if its "only injury arises from the effect of [a challenged action] on the organizations' lobbying activities, . . . or when the service impaired is pure issue-advocacy." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093-94 (D.C. Cir. 2015) (citations omitted); *see also Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) ("In Sierra Club [v. Morton, 405 U.S. 727, 739 (1972)], the Supreme Court recognized that to hold that a lobbyist/advocacy

group had standing to challenge government policy with no injury other than injury to its advocacy would eviscerate standing doctrine's actual injury requirement . . . ."); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("[A]n organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury.").

Because ACC's only purported organizational injury is expenditure of resources for advocacy activities aimed at lobbying EPA and NAS—specifically, by funding formaldehyde studies and drafting letters and comments to EPA and NAS during their respective review processes—Plaintiff does not have organizational standing. Pl.'s Mem. at 16. These projects fall squarely within the definition of "advocacy" because their purpose was to "shed[] light" on what ACC wants the government to adopt as its accepted risk level of formaldehyde. *See Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 35 (D.D.C. 2020) (holding that the funding of organization's own engineering study could not confer standing because it was a form of advocacy to "shed[] light on what these organizations believe were the true causes of the September 11 attacks"), *aff'd* 848 F. App'x 528 (D.C. Cir. 2021).[5] Indeed, if ACC's efforts here were sufficient to establish organizational standing, then virtually any organization would have

_____

[5] Plaintiff's reliance on *Scenic America, Inc. v. U.S. Department of Transportation*, 983 F. Supp. 2d 170 (D.D.C. 2013), is misplaced. Pl.'s Mem. at 16. Contrary to Plaintiff's suggestion, *Scenic America* did not find organizational standing based on the fact that the plaintiff "participated in agency meetings and challenged agency action." *Id.* Rather, the court held that the organization had standing to challenge guidance allowing digital billboards along interstate highways, even though some of its activities were "'pure-issue advocacy'" that would not suffice to confer organizational standing" (i.e. lobbying for moratoriums on billboard construction and coordinating letter-writing and petition campaigns) because the group's *other* anti-billboard efforts were more akin to the type of counseling and referral services that can successfully establish standing (*i.e*, challenging specific billboards at local zoning meetings, sharing information with affected communities, and managing digital alert systems). *Scenic Am., Inc.*, 983 F. Supp. 2d at 178-79. All of Plaintiff's activities here are akin to the "pure-issue advocacy" activities that the *Scenic America* Court found insufficient for organizational standing purposes.

standing to challenge a government process so long as it spends time or money on advocacy efforts to lobby the agency or disrupt its process. Article III requires more.

C.  <u>Plaintiff Lacks Associational Standing to Sue Federal Defendants</u>

Plaintiff also lacks associational standing to sue Federal Defendants. An organization has standing to sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977). Plaintiff has failed to allege any facts that could establish its members would have standing to sue Federal Defendants.

As noted above, Plaintiff has not identified any concrete injury that has flowed to its members as a result of its claims against Federal Defendants in this case. Instead, Plaintiff's theory is based on a speculative chain of hypothetical future events, positing: (i)  that EPA might release an IRIS assessment of formaldehyde that ACC's members disagree with, which points of disagreement could be the result of EPA's reliance on the NAS Report; *and then* (ii) that EPA could use that IRIS assessment in support of any number of unknown regulatory purposes; *and then* (iii) that EPA's hypothetical future regulatory actions could harm ACC's members businesses in some unknown way that is traceable back to the IRIS assessment and specifically to its reliance on the NAS Report. Pl.'s Mem. at 18-19.

This "chain of possibilities" is far "too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending,'" *Clapper*, 568 U.S. at 401 (quoting *Whitmore*, 495 U.S. at 158), much less that any future injury would be traceable to EPA's use of the NAS Report at issue in this case. For example, even if a future EPA regulation were to

injure an ACC member in some way, that member would have to show that the harmful feature of that regulation was caused by the IRIS assessment, which then in turn was faulty because of some relevant aspect of the NAS Report—rather than because of some other cause (*e.g.*, someone else's comments during the rulemaking, the agency's own analysis and initiative, or a state's implementation decisions, if applicable). *See Pena*, 147 F.3d at 1026 n.8 ("If a [committee] report . . . cannot be acted on by the agency without first undertaking a rulemaking or adjudication, the plaintiff may have difficulty showing the [alleged] FACA violation is responsible for a concrete injury it has sustained or will sustain based on the administrative decisionmaking process."). Courts routinely reject standing based on such "remote and uncertain" connections between the actions of an advisory committee, an agency's actions in setting standards or making regulatory choices, and any actual harm to an industry's concrete interests. *See R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 810 F.3d 827, 829-30 (D.C. Cir. 2016) (tobacco company lacked standing to challenge alleged conflicts of interest of FDA committee members); *Metcalf v. Nat'l Petroleum Council*, 553 F.2d 176, 186-88 (D.C. Cir. 1977) (consumer lacked standing to challenge fair balance of oil advisory committee on the theory that "biased" advice from oil company representatives would increase prices). That disconnect is even more pronounced here, where Plaintiff has not alleged that any actual harm to its members' industry interests has even come to pass.

## II.   PLAINTIFF FAILS TO STATE A CLAIM AGAINST FEDERAL DEFENDANTS AS A MATTER OF LAW

Even if Plaintiff had standing to pursue its claim against Federal Defendants, its claims fails as a matter of law. Plaintiff's complaint asserts only one cause of action against EPA, which it captions as "Unlawful Reliance on [the NAS] Report in Violation of FACA . . . and the APA." Compl. ¶¶ 161-68. It is well-settled that FACA does not confer a private right of action. *See Nat'l*

*Res. Def. Council v. Abraham*, 223 F. Supp. 2d 162, 176 (D.D.C. 2002) (holding that the Supreme Court has "mandate[d] a finding that FACA creates no private cause of action"), *order set aside in part on other grounds* 353 F.3d 40 (D.C. Cir. 2004). Accordingly, Plaintiff's claim must rest solely on the APA. *See, e.g.*, *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 (D.C. Cir. 2008).[6]

Plaintiff has failed to state a claim under the APA. First, even accepting the allegations in Plaintiff's complaint as true, it is clear that EPA did not "manage or control" the NAS Committee within the meaning of FACA; accordingly Federal Defendants cannot be held to account for any alleged FACA violations attributable to the NAS Committee. Second, Plaintiff has not identified any final agency action that it is challenging in this case, which is an essential element for a cause of action under the APA.

Because Plaintiff has failed to state a claim against Federal Defendants, they should be dismissed from this action.

---

[6] In Plaintiff's preliminary injunction briefing, they suggest for the first time and in one sentence that "[t]his Court alternatively has the power to enjoin EPA from relying on the Report under the Mandamus Act." Pl.'s Mem. at 38. But Plaintiff has not pled a cause of action for mandamus against EPA. *See* Compl. ¶¶ 161-68; *see also Adair v. England*, 193 F. Supp. 2d 196, 200 (D.D.C. 2002) (explaining that court does not have jurisdiction to consider issues raised for the first time in motion for preliminary injunction and not in the complaint). Nor does Plaintiff even attempt to explain how the Mandamus Act would apply to EPA under the circumstances here. A writ of mandamus is "a drastic [remedy], to be invoked only in extraordinary situations." *N. States Power Co. v. U.S. Dep't of Energy,* 128 F.3d 754, 758 (D.C. Cir. 1997) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)). Mandamus relief is appropriate only where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010) Plaintiff's briefing does not even acknowledge this test, much less meet its burden to demonstrate how its strict elements could be met with respect to Federal Defendants.

A.  <u>Plaintiff Fails to State a Claim that EPA "Managed or Controlled" the Committee</u>

Plaintiff asserts that Federal Defendants violated FACA (and by extension the APA) because EPA "effectively selected Committee members and controlled the activities and reports of the Committee." Compl. ¶ 164. But nothing in Plaintiff's Complaint casts doubt on the fact that the NAS Committee operated with the requisite independence contemplated by FACA. Accordingly, any actions by the NAS Committee cannot be imputed to Federal Defendants.[7]

Under FACA, a committee created by NAS to provide advice or recommendations to a federal agency cannot be "subject to any actual management or control by an agency or an officer of the Federal Government." 5 U.S.C. § 1014(a)(1). The law is clear that, for purposes of FACA, what constitutes "actual management or control"—a term of art under FACA—is a high bar. *See Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1450 (D.C. Cir. 1994). Mere "influence is not control" and even "significant influence" is insufficient to show actual management or control under FACA. *Id.* at 1451. Rather, a committee must be "so 'closely tied' to an agency as to be amenable to 'strict management by agency officials.'" *Id.* (*quoting Food Chem. News v. Young*, 900 F.2d 328, 332-33 (D.C. Cir. 1990)).

Plaintiff ignores these standards and instead relies on a more colloquial understanding of "manage" or "control." Plaintiff argues that EPA improperly "managed or controlled" the NAS Committee: (1) by "limit[ing] the contract task order" when it set the scope of work in its initial contract with NAS; and (2) by an EPA employee responding to NAS's request seeking suggestions for potential committee members. Pl.'s Mem. at 34-37. These allegations, even if accepted as true,

---

[7] All of the other purported FACA violations asserted in the Complaint are based on alleged actions of NAS and its committee, not Federal Defendants. *See* Compl. ¶¶ 128-60; 165-66. As noted *supra* in footnote 6, Federal Defendants do not agree and in no way concede that NAS violated FACA in any way.

do not come close to meeting FACA's strict standard. Indeed, courts have consistently found no management or control in situations where agency influence is far more substantial than what is alleged here. For example, in *Washington Legal Foundation v. U.S. Sentencing Commission*, 17 F.3d 1446, the Court held that DOJ did not control a committee, even where its members included DOJ employees through whom DOJ would "exercise significant influence over [the committee's] deliberations and on the ensuing recommendations." *Id.* at 1451; *see also Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 35 F.4th 1225, 1247-48 (10th Cir. 2022) (no management or control where evidence established that committee collaborated with the agency by sending the agency updates, regularly emailing the agency to obtain input on relevant issues, and invited agency officials to attend its meetings at which he provided information to the group and responded to questions from committee members; "[a]t most, the evidence suggests that [agency] officials collaborated, or worked in parallel, with the [committee]"), *cert. denied*, 143 S. Ct. 1000 (2023).

A closer look at Plaintiff's factual allegations only confirms that they are insufficient to establish that EPA "managed or controlled" the NAS committee, as those terms are understood under FACA. Plaintiff asserts that EPA "threatened the independence of the peer review process from the outset when it limited the contract task order, thereby controlling the [NAS] Committee's deliberations." Pl.'s. Mem. at 35 & Ex. C. But nothing in FACA limits the ability of an agency to define the task of a committee that it is engaging before it gets started—only that the Committee must be independent from the agency and transparent once its work is underway. *See* 5 U.S.C. § 1014. And there is no question that both EPA and NAS were transparent about the scope of the NAS Committee's task from the outset. As Plaintiff points out, NAS informed ACC and the public about the scope of the Committee's work and repeatedly confirmed it. *See, e.g.*, Pl.'s Mem.at 35-

36. ACC even had an opportunity to submit comments to EPA about the "Charge Questions and Committee Task." Compl. ¶ 54 n.26. And the NAS Report also is transparent about the scope of its charge and the scope of work performed to reach its conclusions. *See* NAS Report at 16. While Plaintiff may disagree about whether the NAS Committee's charge was the best approach and would have preferred that EPA enter into a different contract, that does not make the scoping of work a FACA violation.

Moreover, the Task Order EPA executed with NAS was standard practice for an external peer review, and indeed necessary to set NAS's work in motion. As explained in EPA's Peer Review Handbook, "[w]hen agencies request an NAS peer review . . . a contract mechanism is used. The Agency works with NAS staff to develop a set of charge questions called a 'statement of task' and also helps to define the timing and costs of the review." *See* EPA, Peer Review Handbook § 2.3.7 (4th Ed.), available at *https://www.epa.gov/sites/default/files/202008/documents/epa_peer_review_handbook_4th_edition.pdf* ("Peer Review Handbook"). Then, once the statement of task and budget are approved, "responsibilities for the peer review and products lie with the NAS and not EPA." *Id.* This also is consistent with FACA's implementing regulations, which make clear that the existence of a funding agreement does not constitute actual management or control of the committee by the agency so long as "members of the committee are selected by the academy and if the committee's meetings, deliberations, and the preparation of reports are all controlled by the academy." 41 C.F.R. Part 102-3, subp. E, App. A; *see also* Federal Advisory Committee Management, 66 Fed. Reg. 37728, 37,750 (July 19, 2001).

Plaintiff is also incorrect to assert that "EPA exercised control over the Committee by telling NAS who it should appoint" because the documents it relies upon do not show that EPA told NAS who to appoint to the Committee. Pl.'s Mem. at 36. Plaintiff relies on an isolated email

exchange from the NAS study director (Dr. Kathryn Guyton) to an EPA staff member (Dr. Stan Barone), in which Dr. Guyton sought "suggestions [Dr. Barone] may have for nominees." Pl.'s Mem. Ex. D; Compl. ¶¶ 98-100. At most, these emails reflect that an EPA staff member provided suggestions upon request, not that he selected any nominees or dictated who NAS should appoint to the Committee. Surely if agency employees' actual membership on a committee does not rise to the level of "management or control," as the D.C. Circuit held in *Washington Legal Foundation v. U.S. Sentencing Commission*, 17 F.3d at 1450, a single employee's response to a casual request for recommendations in the early stages of the process does not come close. [8] This isolated interaction between two scientists a year before the NAS Committee had even been constituted is plainly insufficient to establish that EPA "managed or controlled" the committee.

This conclusion is consistent with the bottom-line guidance in the EPA Peer Review Handbook that Plaintiff cites, which states that an agency may provide suggestions of qualified peer reviewers for a contractor to consider, but may not select the peer reviewers itself. Pl.'s Mem. at 36 & n.73; EPA Peer Review Handbook at 59. Plaintiff's focus on the Handbook's guidance regarding the process for when an *agency* comments on a contractor's selection of peer reviewers is misplaced. Pl.'s Mem. at 36. While Federal Defendants do not agree that the process laid out in the Handbook applied under the circumstances here—in which a single employee provided suggestions based on a specific request to him from the contractor—divergence from the process in EPA's handbook would not somehow make it a FACA violation. Nor does the fact that EPA

---

[8]For the same reason, Plaintiff is wrong to suggest that EPA "indirectly control[ed] the activities and reports of the Committee" because the Committee's Study Director is a former EPA employee or because some Committee members have been recipients of EPA grants in other contexts. Compl. ¶¶ 103-07. If participation by current employees is not "management or control," then participation by former employees or grant recipients plainly does not qualify as agency "management or control."

redacted certain information from this exchange between EPA and its contractor under the deliberative process privilege show that EPA improperly controlled the selection process, as Plaintiff suggests. *See, e.g.*, *100Reporters v. U.S. Dept. of Justice*, 248 F. Supp. 3d 115, 147-49 (D.C. Cir. 2017) (holding that privileged communication between agency and a contractor may be withheld under FOIA's exemption 5).

### B. Plaintiff's APA Claim Against Federal Defendants Must Be Dismissed Because It Does Not Challenge Any Final Agency Action

Because the only alleged procedural violations of FACA in this case are not attributable to Federal Defendants, *see supra* Part II.A, and Plaintiff has failed to challenge any other event that could be deemed a final agency action, Plaintiff's APA claim against Federal Defendants fails as a matter of law.[9]

Under the APA, "[a]gency action made reviewable by statute *and final agency action* for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704 (emphasis added). It follows that "[w]hen . . . review is sought not pursuant to specific authorization in the substantive statute, but only under the general provisions of the APA, the 'agency action' in question must be 'final agency action.'" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S.

---

[9] Courts have held that where an advisory committee is part of a federal agency, and then that agency committee fails to comply with various procedural requirements of FACA, its procedural violations may be deemed final agency action subject to review under the APA. *See Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 221 (D.D.C. 2017). This is because, under those circumstances, the committee and the agency were one and the same when they took action that was "not tentative or interlocutory," and may prevent interested parties from enforcing their right to access information. *Judicial Watch, Inc. v. Nat'l Energy Dev. Policy Grp.*, 219 F. Supp. 2d 20, 40 (D.D.C. 2002). Here, by contrast, the NAS Committee is a private entity and cannot be considered part of EPA (nor does Plaintiff make that argument). It follows that any alleged procedural violations are attributable to NAS—not the EPA—as the entity that housed and controlled the committee at issue. Any claimed loss of access to information here is not attributable to Federal Defendants and does not implicate any agency action.

871, 882 (1990) (quoting 5 U.S.C. § 704); *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006). The D.C. Circuit has held that the final agency action requirement is not jurisdictional, but rather supplies a "cause of action in favor of persons aggrieved by agency action." *Id*. In other words, to state a cause of action under the APA, Plaintiff must demonstrate that it is challenging a final agency action by Federal Defendants. *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final agency action here, there is no doubt that appellant would lack a cause of action under the APA.").

An agency action is final if two conditions are met: "First, the action must mark the 'consummation' of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear,* 520 U.S. 154, 177-78 (1977) (citations omitted). Plaintiff has not identified any action by EPA that meets these requirements. It does not allege that EPA has yet relied on the NAS Report, instead speculating about hypothetical steps EPA may take in reliance on the NAS Report at some point in the future and bringing this lawsuit for the very purpose of preventing such reliance on the NAS Report. *See, e.g.*, Pl.'s Mem. at 37 ("EPA's planned reliance" on the Committee's report "*would* violate the APA" and that "[i]t *would* be plainly unlawful, arbitrary, and capricious for EPA to take any action in reliance on the Report.") (emphasis added); Compl. ¶ 167 ("Any EPA finding or conclusion based on a report from NASEM that was developed without scientific integrity *would* be arbitrary and capricious") (emphasis added).  Plaintiff's speculation about what EPA may do in the future does not come close to meeting the requisite standard for final agency action under the APA. While

future injury might suffice for standing purposes if it is concrete and imminent, it must stem from agency action that is not only actual but final in order to support an APA claim.

Nor could EPA's mere use of the NAS Report, even if it had occurred, constitute final agency action at this stage of the IRIS assessment process. First, if EPA were to rely on the NAS Report to guide its revisions to the draft IRIS assessment, that would not be the consummation of the agency's decisionmaking process. Rather, NAS's peer review is merely step four (4b) in EPA's seven-step process. *See* IRIS Process for Developing Human Health Assessments, *available at* https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system#process. The process contemplates that after receiving the Report, EPA will revise its draft assessment, accounting for *both* the peer review and public comments (step 5). *Id.* After that, the draft assessment will proceed to the next phase, which includes further agency review by EPA health scientists, Interagency Science Discussion with other federal agencies, and review by the Executive Office of the President (step 6). *Id.* And only once those additional steps are completed can the agency finalize the assessment and post it to the IRIS website (step 7). *Id.* In other words, any potential reliance by EPA on the NAS Report as part of its currently ongoing assessment process is the epitome of an interlocutory step that will be subject to multiple further layers of editing and review before any assessment can be finalized.

Second, any reliance by EPA on the NAS Report to continue revising its draft IRIS assessment does not determine "rights and obligations." Rather, it is just one interlocutory part of EPA's ongoing deliberations in its work toward providing scientific information about the risks of formaldehyde. A draft IRIS assessment plainly has no legal effect. But even if EPA were to issue its final IRIS assessment—which has not happened and is still several steps away—the final work product still would have no legal consequences. As the D.C. Circuit has explained, an IRIS

assessment "by itself has no preclusive effect; the data in the [IRIS] database constrain[s] no one until so applied in a particular rule." *Chem. Mfrs. Ass'n*, 28 F.3d at 1263.

Accordingly, because Plaintiff has failed to challenge any final agency action, its APA claim against Federal Defendants should be dismissed.[10]

C.  Plaintiff's Claim Against Federal Defendants Should be Dismissed because the United States has not Waived its Sovereign Immunity

It is axiomatic that the United States may not be sued absent a waiver of sovereign immunity. *See Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). While the APA may waive sovereign immunity where a plaintiff seeks non-monetary relief based on "a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority," 5 U.S.C. § 702, Plaintiff here has failed to state any claim against Federal Defendants under the APA or otherwise. Unless and until there is an operative legal claim for this Court to evaluate against Federal Defendants, the waiver of sovereign immunity in § 702 does not apply. *See Pa. Higher Educ. Assistance Agency v. Perez*, 457 F. Supp. 3d 112, 132 (D. Conn. 2020) (concluding that federal agency could not be joined because the "amended complaint does not state a claim against the Federal Defendants [which] therefore negates [5 U.S.C.] § 702's waiver of sovereign immunity"); *Two Shields v. Wilkinson*, 790 F.3d 791, 797-98 (8th Cir. 2015) (affirming dismissal of case because United States was a necessary party and "[s]ince the United

---

[10] Plaintiff's Complaint also lists a separate count against all Defendants seeking declaratory judgment. The Declaratory Judgment Act is not an independent source of federal jurisdiction"; rather, "the availability of such relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960). "[I]n general, a count for [relief under the Declaratory Judgment Act] 'is not cognizable as a separate cause of action, but it is more properly included in the [ ] prayer for relief.'" *Am. First Legal Found. v. Cardona*, 630 F. Supp. 3d 170, 177 (D.D.C. 2022) (quoting *Walpin v. Corp. for Nat'l & Cmty. Serv.*, 718 F. Supp. 2d 18, 24 (D.D.C. 2010)). Because Plaintiff has failed to state a claim upon which relief can be granted, its declaratory judgment claim must also be dismissed.

States has not waived sovereign immunity, it cannot be joined in this action"); *cf. White v. Univ. of Cal.*, 765 F.3d 1010, 1028 (9th Cir. 2014) ("[V]irtually all of the cases to consider the question appear to dismiss under Rule 19, regardless of whether a remedy is available, if the absent parties are Indian tribes invested with sovereign immunity.") (citation omitted).

## III.   PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED

### A.   Plaintiff's Claim Against Federal Defendants is Unlikely to Succeed on the Merits

For all of the reasons stated above, Plaintiff is unlikely to succeed on the merits of its claim against Federal Defendants. But, even assuming *arguendo* that Plaintiff's claim against Federal Defendants could go forward or be deemed to have merit, Plaintiff still would be unlikely to succeed in obtaining the only relief it seeks against Federal Defendants—*i.e.*, a "use injunction."

Plaintiff asks the Court to "[p]ermanently enjoin EPA from accepting, publishing, using, or relying upon the [NAS] Report or any conclusions or recommendations produced by the existing [NAS] Committee." Compl. Prayer for Relief (e). While FACA's NAS Provision states that an agency "may not use any advice or recommendation" provided by NAS unless certain requirements are met, 5 U.S.C. § 1014, the D.C. Circuit has made clear that "[b]ecause of its First Amendment implications, punitive effect and likely standing complications, a use injunction should be the remedy of last resort. While denying a use injunction may leave a plaintiff without an effective remedy, that circumstance cannot determine the plaintiff's ultimate entitlement to the relief." *Pena*, 147 F.3d at 1025-26. Because the instant case is the first time FACA's NAS Provision has been invoked to seek a use injunction, there has not been an opportunity to apply these limiting principles to the NAS Provision. But the same concerns disfavoring a "use injunction" would apply under the circumstances here. The purpose of the NAS provision was to impose some of FACA's transparency requirements on NAS committees, while eliminating other

requirements that would impact NAS's ability to operate independently. *See* 143 Cong. Rec. 25,845. Not applying the limiting principles to a use injunction with respect to NAS committees would be inconsistent Congress's intent to impose fewer constraints in situations where NAS is involved.

Accordingly, the Court should apply the limiting principles set forth by the D.C. Circuit to determine whether the extraordinary relief of a "use injunction" is warranted here. As a threshold matter, the court "should be reluctant to award" a use injunction "[i]f the plaintiff has failed to prosecute its claim for injunctive relief promptly, and if it has no reasonable explanation for its delay." *Pena*, 147 F.3d at 1026. The court "should also consider whether FACA's principal purposes—(1) avoidance of wasteful expenditures and (2) public accountability—will be served by granting a use injunction." *Id.* Because a complaint filed at the end of a committee's process will necessarily produce waste, the court should "consider the magnitude of the waste, the value of the committee's work to the sponsoring federal agency and the effect of the FACA violation on the committee's findings." *Id.* The court's "public accountability inquiry should focus on the actual deprivation resulting from non-compliance. Substantial efforts to include members of the interested public in at least some committee meetings and attempts to screen for conflicts of interest among committee members counsel against a use injunction." *Id.* And "if members of the public will have another opportunity to comment on an agency decision, the district court should determine whether the subsequent opportunity will render harmless (or at least less harmful) the loss of any past opportunity to participate." *Id.* All of these considerations weigh against a use injunction here.

First, Plaintiff has offered no explanation for its delay in bringing this lawsuit. ACC began expressing concerns about the NAS committee as early as April 13, 2022, when it sent a letter to

EPA objecting to the "Charge and Questions and Committee Task." Compl. ¶ 55 n.26. ACC then continued to express its dissatisfaction to NAS throughout the course of its peer review. *See* Pl.'s Mem., Ex. F (August 25, 2022 letter complaining about committee membership); Pl.'s Ex. R (March 2023 letter complaining about committee meetings); Compl. ¶ 126 (April 2023 letter from ACC counsel detailing "all of the concerns and violations" that would later be included in this lawsuit). Plaintiff also was aware that NAS did not agree with its concerns and was proceeding with the peer review and report accordingly. *See, e.g.*, Pl.'s Mem., Ex. J (May 4, 2023, letter from NAS making clear its view that committee's work has complied with FACA in all respects). Yet, Plaintiff waited until July 20, 2023, when the NAS report was nearly complete, to file this lawsuit and still did not seek preliminary relief at that time. ECF 1. Plaintiff then waited another two months before seeking a preliminary injunction, and did so only after the NAS Committee completed its work and released its report. In sum, Plaintiff could have sought emergency equitable relief long before the committee's work was completed. But it chose not to do so.

Second, a use injunction would be wasteful. NAS spent sixteen months convening the committee, conducting the review, and preparing the report. The budget for the project was over $600,000 in federal funds, Task Order at i, the expenditure of "which weighs heavily against a use injunction." *NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, No. 20-1132, 2020 WL 6392777, at *5 (D.D.C. Nov. 20, 2020). "[U]se injunctions granted where 'a committee has completed its meetings and is in the process of wrapping up its affairs will likely produce waste.'" *Id.* (quoting *Pena*, 147 F.3d at 1026). That is even more true under the circumstances here, when the committee has actually completed its report.

Third, "[t]he need for injunctive relief may be reduced where . . . there has been at least some attempt to ensure public accountability." *Id.* (quoting *Cal. Forestry Ass'n v. U.S. Forest*

*Serv.*, 102 F.3d 609, 614 (D.C. Cir. 1996). Both EPA and NAS have provided information to Plaintiff and the public at every step. The Task Order and membership selection have been public from the beginning. Indeed, Plaintiff had opportunities to comment on both and did so. *See* Compl. ¶ 55 n.26; Pl.'s Mem., Ex. F. And meeting agendas, presentations, recordings, as well as documents provided by EPA were made publicly available. NAS Report, Appx. B. The NAS Committee also held several open sessions with public comment periods, and welcomed submissions of written comments and other materials relevant to the committee's charge throughout the duration of the review. NAS Report at 16-17. These many efforts to ensure transparency satisfy FACA's requirements, but at a minimum they are sufficient to qualify as "some attempt to ensure public accountability." *NAACP Legal Def. & Educ. Fund, Inc.*, 2020 WL 6392777, at *5.

Finally, even if Plaintiff were denied the opportunity to share its concerns with the NAS Committee—which it was not—it will have other opportunities to raise those concerns should EPA take regulatory action in the future. The crux of Plaintiff's complaint with respect to Federal Defendants is Plaintiff's concern about regulatory actions EPA may take in the future. *See supra* Part I. If EPA engages in any future action that affects the rights and obligations of ACC and its members, ACC can raise concerns about and comment on EPA's reliance on the NAS Report at that time, if relevant. *See Chem. Mfrs. Ass'n.*, 28 F.3d at 1262 (addressing procedural and substantive objections to EPA's use of IRIS assessment information in the final EPA rule).

Accordingly, because Plaintiff has failed to state any legally-cognizable claim against Federal Defendants, and because Plaintiff has failed to state a basis for the Court to "[p]ermanently enjoin EPA from accepting, publishing, using, or relying upon the Report," which is the only form

of injunctive relief sought against Federal Defendants, Compl., Prayer for Relief (e), Plaintiff is unlikely to succeed on the merits.

B.  Plaintiff Will Not Suffer Imminent Irreparable Harm Absent Preliminary Relief

To establish irreparable harm, the party seeking a preliminary injunction must show "that the harm is 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Cap. Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 301 (D.D.C. 2020) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016)). As discussed above, Plaintiff's theory of harm at the hands of Federal Defendants rests on a "speculative chain of possibilities" that cannot demonstrate even injury in fact, much less irreparable harm. *See Clapper*, 568 U.S at 414; *see supra* Part I.

Plaintiff's theory of irreparable harm requires multiple layers of conjecture. First, Plaintiff posits that EPA "will treat the [NAS] Report as supporting EPA's draft Assessment, finalize the Assessment in a form that is essentially the same as EPA's draft, and set IRIS values accordingly." Pl.'s Mem.at 39-40. Even at this first step, Plaintiff's argument is speculative and purely theoretical. While the NAS Report found that EPA's draft assessment "follows the advice of prior National Academies reports and that its findings on hazard and quantitative risk are supported by the evidence identified," Compl. ¶ 24 (citation omitted), the report also identified numerous areas for improvement. *Id.* Not only will EPA revise the IRIS Assessment based on the NAS Report, but per the IRIS process, EPA will also to seek additional comments from EPA's program offices and discuss revisions with other federal agencies and the Executive Office of the President. EPA may then further revise the assessment based on that feedback. *See* EPA, *Basic Information About IRIS*. Whatever IRIS values EPA ultimately sets will be the result of this entire process combined, including input received both before and after NAS's peer review. Under these circumstances, any

assumption about the content of EPA's final IRIS assessment—and the possibility that it might rely on the NAS Report in a manner that causes harm to Plaintiff—is just that, an assumption.

More fundamentally, Plaintiff fails to identify any concrete and imminent injury it would face even if EPA were "to finalize the IRIS values based on NAS's Report." Pl.'s Mem. at 44. Plaintiff proposes a long list of hypotheticals about how the as-yet-unfinished IRIS assessment could be used in the future. For example, Plaintiff predicts EPA "will use the IRIS Assessment for purposes of regulation under [the Toxic Substances Control Act and the Federal Insecticide Fungicide and Rodenticide Act]," or to set air emissions reporting requirements. *Id.* at 40-41. Plaintiff also worries that DOJ might use the conclusions in EPA's IRIS assessment "as the basis for enforcement actions," or that states will regulate formaldehyde based on the IRIS assessment, or that the IRIS assessment will result in marketplace stigma. *Id.* at 42-43. That is all conjectural; Plaintiff has not established that any of these outcomes have actually occurred, or that they will occur imminently and in a manner that harms ACC or its members in a concrete way. "No matter the stakes and no matter the cause, courts may not grant the "'extraordinary remedy' of an injunction 'based only on a possibility of irreparable harm.'" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45, 62 (D.D.C. 2021) (quoting *Winter*, 555 U.S. at 22).

Finally, Plaintiff's even more removed and generalized concerns about its members' "de-selection from the market," Pl.'s Mem. at 43, and that "EPA's use of IRIS values consistent with the Assessment [] will cause substantial and irreparable harm to the businesses of ACC's members who produce and use formaldehyde," *id.* at 41, are insufficient to meet the demanding irreparable harm standard. Irreparable harm "requires more than conclusory assertions of potential loss. To permit the Court to evaluate the nature and extent of the alleged irreparable injury, the movant bears the burden of presenting 'specific details regarding the extent to which [its] business will

suffer.'" *Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 171 (D.D.C. 2018) (quoting *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Res. Syst.*, 773 F. Supp. 2d 151, 181 (D.D.C. 2011)). Plaintiff has not come close to meeting that heavy burden.

      C.  <u>The Balance of Equities and Public Interest Do Not Support a Preliminary Injunction</u>

      The balance of equities and public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. A preliminary injunction would not serve the public interest here. If EPA is enjoined from using the NAS Report, it will impede the release of its IRIS assessment, which is a public resource that is thirteen years in the making. The draft IRIS assessment has been developed using significant public resources and with the benefit of input from myriad stakeholders, including public commenters, other federal agencies, and multiple independent peer review committees. And the public also has an interest in EPA being allowed to complete its process more broadly, since its purpose is to provide information about the health risks of formaldehyde, which is a high production volume chemical that is present in a wide variety of products and is ubiquitous in air.

      By contrast, an injunction against Federal Defendants would not serve any countervailing public interest. Notwithstanding Plaintiff's assertions, the value of EPA's work to assess the risks of formaldehyde is not undermined by the NAS Report. Even assuming *arguendo* that the NAS Committee could have provided more information about its meetings or its membership pursuant to FACA, that would not be a basis to upend EPA's scientific conclusions that were developed over the course of a decade and through a process that involved multiple opportunities for public comment. The NAS peer review was just one step of many in the lengthy IRIS process. Both EPA's task order and the NAS Report were explicit about the nature of the NAS Committee's charge, which is just the type of transparency at the core of FACA. Thus, Plaintiff's conjecture

that another peer review with additional FACA disclosures would result in different conclusions in EPA's assessment is wildly speculative and out-of-step with the facts.

At bottom, Plaintiff's concern is that finalization of EPA's draft assessment will hurt the business interests of formaldehyde manufacturers. Whether or not NAS satisfied certain procedural requirements in the course of its peer review is far afield from those concerns and cannot justify the waste and delay that would result from a preliminary injunction.

## IV.   LOCAL RULE 7(n) SHOULD BE WAIVED BECAUSE THE MOTION TO DISMISS CAN BE DECIDED WITHOUT AN ADMINISTRATIVE RECORD

Finally, Federal Defendants respectfully request that the Court grant them relief from compliance with Local Rule 7(n) because the Court can decide their Motion to Dismiss without reference to an administrative record. Local Rule 7(n) requires an agency to provide an administrative record to Plaintiff and to "file a certified list of the contents of the administrative record with the Court within 30 days following service of the answer to the complaint or simultaneously with the filing of a dispositive motion, whichever occurs first." Yet, further text in the rule indicates that these obligations are meant to aid decision of a dispositive motion that *relies* on an administrative record. *See* LCvR 7(n)(1) (directing counsel to "provide the Court with an appendix containing copies of those portions of the administrative record that are *cited or otherwise relied upon* in any memorandum in support of or in opposition to any dispositive motion") (emphasis added). Indeed, the Comment to Local Rule 7(n) notes that "[t]his rule is intended to assist the Court in cases involving a voluminous record . . . ." Comment to LCvR 7(n). Thus, Local Rule 7(n) should not apply because Defendants' motion to dismiss does not rely on the administrative record. Indeed, given that there is no final agency action challenged in this case, *see supra* Part II.B, it is unclear what an administrative record could even entail under the circumstances here.

In addition, the D.C. Circuit has long recognized that a court can resolve claims at the motion to dismiss stage without the administrative record where the record is not germane to the issues presented in the motion to dismiss. *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266–67 (D.C. Cir. 2001) (affirming dismissal of plaintiff's claims and rejecting appellant's argument that the district court erred in refusing to compel production of the administrative record before deciding motion to dismiss). Defendants have explained above why the Complaint is itself fatally defective. The Court need not review an administrative record to resolve Federal Defendants' motion to dismiss, which, as a procedural matter, only examines Plaintiff's Complaint.

In such cases, courts in this District routinely grant relief from Local Rule 7(n). *See, e.g.*, *Mukkavilli v. Jaddou,* No. 22-cv-2289, 2023 WL 4029344, at *5 n.2 (D.D.C. June 15, 2023) (McFadden, J.) ("Production of the record [was] unnecessary to resolve the arguments" in the motion to dismiss.); *Patterson v. Haaland*, No. 1:21-cv-02391, 2022 WL 4534685, at *1 (D.D.C. Sept. 28, 2022) (Contreras, J.) (similar); *Desai v. U.S. Citizenship & Immigr. Servs.*, No. 20-1005, 2021 WL 1110737, at *5 n.7 (D.D.C. Mar. 22, 2021) (Kollar-Kotelly, J.) (similar); *Nohria v. Renaud*, No. 20-cv-2085, 2021 WL 950511, at *4 n.3 (D.D.C. Mar. 14, 2021) (Howell, C.J.) (similar); *Akbar v. Cuccinelli*, No. 18-2808, 2020 WL 1287817, at *4 (D.D.C. Mar. 18, 2020) (Lamberth, J.) (similar). Defendants respectfully request that the Court do the same here.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court dismiss Plaintiff's Complaint as to Federal Defendants with prejudice, deny Plaintiff's Motion for Preliminary Injunction, and waive compliance with Local Rule 7(n).

Dated: November 13, 2023

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director
Federal Programs Branch

*/s/* Emily B. Nestler
Emily B. Nestler (DC Bar No. 973886)
Civil Division, Federal Programs Branch U.S.
Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 305-0167
E-mail: emily.b.nestler@usdoj.gov

*Counsel for Defendants*
*U.S. Environmental Protection Agency*
*and Michael S. Regan*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 13th day of November, 2023, a true and correct copy of this

document was served electronically by the Court's CM/ECF system to all counsel of record.


*/s/ Emily B. Nestler*
Emily B. Nestler