**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN CHEMISTRY COUNCIL, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>NATIONAL ACADEMY OF SCIENCES et al.,<br><br>    Defendants. | Civil Action No. 23-2113 (JDB) |

## MEMORANDUM OPINION

This case concerns a peer review committee convened by the National Academy of Sciences (the "Academy" or "NAS") under contract with the Environmental Protection Agency ("EPA") to evaluate the agency's draft hazard assessment for the chemical formaldehyde. The American Chemistry Council ("ACC"), a trade association of chemical manufacturers, has sued the Academy and EPA under the Mandamus Act and the Administrative Procedure Act claiming that the committee was convened in violation of the Federal Advisory Committee Act. Before the Court is ACC's motion for a preliminary injunction and each defendant's motion to dismiss. The Court will dismiss the Academy because it is a private entity over which the Court cannot exercise mandamus jurisdiction. The Court will also dismiss EPA because ACC lacks standing to prosecute its claims against the agency. Accordingly, the Court will deny ACC's motion for a preliminary injunction as moot.

## Background

### I.    Statutory Background

The Federal Advisory Committee Act ("FACA") regulates the establishment, termination, operation, and use of committees charged with providing advice to the federal government.  See 5

1

U.S.C. § 1002.  Enacted in 1972, "[i]ts purpose was to ensure," among other things, that such committees' "creation, operation, and duration be subject to uniform standards and procedures." Pub. Citizen v. U.S. Dep't of Just., 491 U.S. 440, 446 (1989).  The requirements of FACA apply to any government "advisory committee"—a term of art under FACA that refers to committees "established by statute" or "established or utilized by the President [or by] . . . one or more agencies." 5 U.S.C. § 1001(2)(A).

Every advisory committee must be established pursuant to a charter filed with the General Services Administration, which sets out, inter alia, the committee's objectives, scope, the "agency or official to whom the committee reports," the frequency of its meetings, and the date on which it will terminate.  5 U.S.C. § 1008(c)(2).  A committee must be chaired by an officer or employee of the federal government, without whom the committee cannot meet.  Id. § 1009(e).  The Act also creates a presumption of open access to meetings and records.  Id. § 1009(a)–(d).  Finally, FACA mandates that advisory committees be "fairly balanced in terms of the points of view represented and the functions to be performed," id. § 1004(b)(2), and that "advice and recommendations of the advisory committee . . . not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment," id. § 1004(b)(3).

In 1997, the D.C. Circuit held that the Academy was "quasi-public" and therefore its committees were "utilized" by federal agencies and subject to FACA.  Animal Legal Def. Fund v. Shalala, 104 F.3d 424, 431 (D.C. Cir. 1997).  Congress almost immediately amended FACA to clarify that committees "created by the National Academy of Sciences or the National Academy of Public Administration" were not advisory committees.  5 U.S.C. § 1001(B)(ii); see also 143 Cong. Rec. H10579 (daily ed. Nov. 9, 1997) (statement of Rep. Horn) (explaining Congress's purpose of overruling Animal Legal Defense Fund).  At the same time, Congress decided to place

certain similar public disclosure and fair balance requirements on committees of the Academy. See 5 U.S.C. § 1014.

The statute regulating Academy committees—known as Section 15—follows a similar pattern as FACA, although it has some key differences.  To begin, Section 15 requires the Academy to take public input on committee nominations.  Specifically, the statute requires the Academy to "provide public notice" and "brief biographies" of individuals it plans to appoint to a committee, and to give the public a "reasonable opportunity" to comment before appointments are made.  5 U.S.C. § 1014(b)(1).  The Academy must further "make its best efforts to ensure that," id. § 1014(b)(1), committee members do not have any conflicts of interest "relevant to the functions to be performed" unless such conflict is "promptly and publicly disclosed and the Academy determines that the conflict is unavoidable," id. § 1014(b)(1)(A).  The Academy must also "make its best efforts to ensure that," id. § 1014(b)(1), the "committee membership is fairly balanced as determined by the Academy to be appropriate for the functions to be performed," and "the final report of the Academy will be the result of the Academy's independent judgment."  Id. § 1014(b)(1)(B)–(C); see 41 C.F.R. § 102-3.185 (2024) (GSA regulations concerning the same).

Section 15 also requires the Academy to "provide public notice of committee meetings" and to "ensure that meetings of the committee to gather data from individuals who are not officials, agents, or employees of the Academy are open to the public."  5 U.S.C. § 1014(b)(2)–(3).  But Section 15 permits the Academy to close non-data-gathering meetings as long as it provides a "brief summary" identifying "the committee members present, the topics discussed, materials made available to the committee, and other matters the Academy determines should be included." Id. § 1014(b)(4).  If any of the above requirements are not met—or if the committee was "subject to any actual management or control by an agency or an officer of the Federal Government"—an agency "may not use" an Academy committee's "advice or recommendation."  Id. § 1014(a).

## II.     Factual Background

At issue here are several challenges to an Academy committee engaged to conduct external peer review on an EPA assessment of the chemical formaldehyde.  As part of its Integrated Risk Information System ("IRIS"), EPA reviews data on potentially hazardous chemicals and develops assessments identifying levels of exposure at which humans face higher risk of deleterious health effects and cancer.  See Am. Compl. [ECF No. 15] ¶ 28; Integrated Risk Information System (IRIS); Health Risk Assessment; Guidelines, etc., 53 Fed. Reg. 20162, 20162–64 (June 2, 1988).  In developing those assessments, EPA takes public comment, solicits peer review, and seeks input from federal stakeholders.  See EPA, Basic Information About the Integrated Risk Information System,          https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system#process [https://perma.cc/WC53-5CH2].  Once complete, the assessments are compiled in IRIS and provide an "important source of toxicity information used by EPA, state and local health agencies, other federal agencies, and international health organizations."  Am. Compl. ¶ 28.

In 1989, EPA first produced an IRIS assessment of formaldehyde—a "widely present" chemical "used in many manufactured goods," "formed by combustion sources," and "produced in humans."  NAS Rep. [ECF No. 17-3] at 1; see Am. Compl. ¶ 1.  Despite its ubiquity, EPA identified formaldehyde as a "probable human carcinogen."  NAS Rep. at 1.  In the 2000s, EPA began the "process of re-evaluating the health impacts of formaldehyde," culminating in a 2010 draft IRIS assessment for the chemical.  Am. Compl. ¶ 43.  As part of the IRIS process, EPA asked the Academy to conduct an independent peer review.  Id.  The committee's report was critical of the assessment and concluded that it was not methodologically sound.  See id. ¶ 44.  Over the next decade, EPA worked on revising the draft assessment.  See id. ¶ 46–48.

EPA finished a new draft assessment in 2022 and again engaged the Academy to convene a peer review committee.  Am. Compl. ¶ 48.  The 2022 Task Order required the Academy to

"establish an expert panel of up to 12 experts following [the Academy's] procedures on committee composition, balance, and conflict of interest."  Task Order [ECF No. 17-5] at 2.  The committee would be filled after taking "public nominations for panel members and solicit[ing] comments on the panel."  Id.  The committee's task, as outlined in the agreement, was to "evaluat[e] whether the scientific literature was adequately evaluated by EPA, and whether appropriate methods were used to synthesize the current state-of-the science"—pursuant to specific "charge questions" submitted by EPA.  Id. at 2.  The committee was "not" to "conduct an independent assessment separately from the IRIS document," nor to "comment on the broader aspects of the IRIS Program."  Id. at 2; see Am. Compl. ¶ 95.

Pursuant to the Task Order, the Academy solicited nominations for members from the public, see Mem. in Supp. of Mot. for Prelim. or Permanent Inj. Relief [ECF No. 17-1] ("ACC Mot.") at 7; Call for Nominations Email [ECF No. 17-6] at *3–7, as well as from EPA, Am. Compl. ¶¶ 98–100.  The Academy assembled a proposed peer review committee and provided the public twenty calendar days (fourteen business days) to comment on a provisional committee membership.  Am. Compl. ¶ 93.  To facilitate the public review, the Academy provided brief biographies of the potential members.  See id. ¶ 82.

The Academy ultimately selected a committee of scientists to review the assessment.  The committee comprised several epidemiologists, but not any with significant "backgrounds and expertise in private sector industrial toxicology and industrial epidemiology."  Am. Compl. ¶ 64.  The committee also included members with historical ties to EPA and the IRIS process.  For example, one member previously "chaired [an Academy] Committee hosting a workshop to 'support development of EPA's IRIS Toxicological Reviews,'" and served as a "'faculty fellow to the IRIS Program from 2011 to 2013,' [where] he 'interacted with IRIS staff on a variety of scientific and methodological issues directly relevant to implementation of the advice from the

National Academies.'"  Id. ¶ 74.  Further, the study director, who plays an important administrative role and drafts sections of the report, had previously worked in the IRIS program at EPA, id. ¶¶ 103, 105, including co-chairing a working group on intra-agency review of EPA's 2010 formaldehyde report, id. ¶ 77, and contributing one of the papers on which the new formaldehyde assessment relied, id. ¶ 78.

The committee engaged in a months-long review of the assessment, considering presentations from EPA as well as limited comments from the public.  See Am. Compl. ¶¶ 112, 117–18.  Ultimately, the committee published a favorable report on the formaldehyde assessment. The report concluded that "the methods used for the assessment were appropriate and reflect EPA's current practices in some components of the IRIS process."  Id. ¶ 49 (quoting NAS Rep. at xi–xii). The committee stated that the assessment's "findings on hazard and quantitative risk are supported by the scientific evidence identified."  Id.

### III.   Litigation History

Claiming that the formaldehyde peer review committee violated Section 15, ACC filed a complaint for declaratory and injunctive relief against the Academy, EPA, and EPA Administrator Michael Regan, in his official capacity.  Am. Compl. ¶¶ 28–30.  To the Court's knowledge, ACC's lawsuit is the first to be decided under the 1997 FACA amendments pertaining to the Academy.

The amended complaint seeks mandamus relief against the Academy, alleging that the Academy violated its clear duties under Section 15.  To begin, ACC claims the Academy failed to make "best efforts" to assemble a fairly balanced committee as required by 5 U.S.C. § 1014(b)(1)(B) because the committee lacked individuals with expertise in industrial and occupational toxicology.  Am. Compl ¶¶ 128–32.  ACC further claims that the Academy failed to make "best efforts" to avoid conflicts of interest, 5 U.S.C. § 1014(b)(1)(A), by appointing committee members with past ties to EPA and the IRIS program.  Am. Compl. ¶¶ 133–39.  ACC

also argues that the Academy failed to meet its public disclosure obligations, 5 U.S.C. § 1014(b)(1), (b)(3)–(4), because, among other things, the committee biographies did not include relevant details about the members' conflicts and summaries of closed meetings were cursory. Am. Compl. ¶¶ ¶¶ 59, 81–83, 93–94, 140–51.  Ultimately, ACC claims that the Academy did not exercise its own "independent judgment," 5 U.S.C. § 1014(b)(1)(C).  Id. ¶¶ 156–160.

The amended complaint also states claims against EPA under the Administrative Procedure Act ("APA").  ACC asserts that EPA exercised inappropriate "management or control," 5 U.S.C. § 1014(a), over the committee by the execution of a Task Order that limited the scope of the committee's review, and through its connections with the study director and committee members. Am. Compl. ¶ 60, 95–101.  Because Section 15 prohibits an agency from using any advice or recommendation of a NAS committee convened in violation of FACA, ACC contends that these failures should result in the report being scrapped.  Id. ¶ 168; see 5 U.S.C. § 1014(a).

ACC seeks a declaratory judgment that the Academy violated FACA in several ways, that EPA impermissibly controlled the committee, and that EPA's use of the report violated the APA. Am. Compl., Prayer for Relief ¶¶ (a)–(b), (d).  ACC also seeks an injunction directing the Academy to include a disclaimer on the report stating that it was produced in violation of FACA and should not be used by any agency. Id. ¶ (c).  Finally, ACC seeks an injunction prohibiting EPA from "accepting, publishing, using, or relying upon the [r]eport."  Id. ¶ (e).

On October 13, 2023, ACC filed a motion for preliminary or permanent injunctive relief against both defendants.  See ACC Mot.  EPA and the Academy each opposed ACC's motion, filing combined oppositions and motions to dismiss.  See NAS Mem. in Supp. of Mot. to Dismiss & Opp'n to ACC Mot. [ECF No. 19-1] ("NAS Mot. & Opp'n"); Fed. Defs.' Combined Mem. in Supp. of Mot. to Dismiss & Opp'n to ACC Mot. [ECF No. 21-1] ("EPA Mot. & Opp'n").  ACC filed a combined opposition to defendants' motions and a reply in support of its motion for

preliminary injunction.  Pl.'s Reply in Supp. of ACC Mot. [ECF No. 23] ("ACC Reply & Opp'n").

Both defendants filed replies in support of their motions.  Fed. Defs.' Reply in Supp. of Mot. to

Dismiss [ECF No. 26]; NAS Reply in Supp. of Mot. to Dismiss [ECF No. 27].  The Court held

oral argument on the three motions on February 8, 2024.  The motions are now ripe for decision.

## Legal Standard

Before the Court can proceed to the merits of a case, it must first determine whether it has

subject matter jurisdiction.  Lovitky v. Trump, 949 F.3d 753, 758 (D.C. Cir. 2020).  A Rule

12(b)(1) motion to dismiss for lack of subject matter jurisdiction (including standing) may raise a

"facial" or "factual" challenge to a plaintiff's assertion of jurisdiction.  Pub. Citizen, Inc. v. Trump,

361 F. Supp. 3d 60, 70–71 (D.D.C. 2019).  In the context of a facial challenge, the court treats the

motion as it would under Rule 12(b)(6), accepting the plaintiff's factual allegations as true and

drawing all reasonable inferences in plaintiff's favor.  Id. at 71; see also Banneker Ventures, LLC

v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (taking the allegations of the complaint as true

when ruling on a 12(b)(1) motion).  The motion should be denied if the plaintiff has alleged facts

sufficient to support a plausible basis for the court's subject matter jurisdiction.  See Pub. Citizen,

Inc., 361 F. Supp. 3d at 70–71; Syngenta Crop Prot., Inc. v. Drexel Chem. Co., 655 F. Supp. 2d

54, 58–59 (D.D.C. 2009).  Alternatively, a defendant may raise a factual challenge to plaintiff's

subject matter jurisdiction.  In such a case, the court may consider not only the complaint

supplemented by undisputed facts but also "the court's resolution of disputed facts."  Banneker

Ventures, LLC, 798 F.3d at 1129 (quoting Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C.

Cir. 1992)); see Pub. Citizen, Inc., 361 F. Supp. 3d at 71.  Here, additional, undisputed facts were

presented through the motion for preliminary injunction briefing.  While the Court relies primarily

on the amended complaint, it will also rely sparingly on declarations and supporting materials

filed.

<u>**Analysis**</u>

Both defendants raise threshold jurisdictional challenges to this Court's subject matter jurisdiction to hear ACC's claims under FACA. The Academy claims that ACC has not established this Court's jurisdiction because it is not a federal officer, employee, or agency subject to the Mandamus Act.[1] NAS Mot. & Opp'n at 8–14. EPA, on the other hand, challenges ACC's constitutional standing. EPA Mot. & Opp'n at 2–9. Where both standing and subject matter jurisdiction are at issue, "a court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." <u>Lovitky</u>, 949 F.3d at 758 (quoting <u>Moms Against Mercury v. FDA</u>, 483 F.3d 824, 826 (D.C. Cir. 2007)).

## I.   The Academy's Rule 12(b)(1) Motion

There is now consensus in this district that FACA does not supply an independent cause of action and therefore does not establish the Court's subject matter jurisdiction. <u>See Dunlap v. Presidential Advisory Comm'n on Election Integrity</u>, 464 F. Supp. 3d 247, 265 (D.D.C. 2020); <u>Ctr. for Biological Diversity v. Tidwell</u>, 239 F. Supp. 3d 213, 220–21 (D.D.C. 2017); <u>see also</u> ACC Reply & Opp'n at 39 (conceding that "FACA does not provide a private cause of action"). Hence, when a party sues to enforce the requirements of FACA, it must identify an alternative source of jurisdiction. <u>See Dunlap</u>, 464 F. Supp. 3d at 265; <u>see also</u> <u>NAACP Legal Def. & Educ. Fund v. Barr</u> ("<u>Legal Defense Fund</u>"), 496 F. Supp. 3d 116, 125–26 (D.D.C. 2020) (pleading claims under the APA, Mandamus Act, and Declaratory Judgment Act). Put differently, the Court may only review a FACA claim brought pursuant to another jurisdiction-conferring statute, typically, the Mandamus Act, 28 U.S.C. § 1361, or the federal question statute, <u>id.</u> § 1331, the

---

[1] ACC's claim under the Declaratory Judgment Act does not independently establish the Court's jurisdiction. <u>See Ali v. Rumsfeld</u>, 649 F.3d 762, 778 (D.C. Cir. 2011) ("It is a well-established rule that the Declaratory Judgment Act is not an independent source of federal jurisdiction. Rather, the availability of declaratory relief presupposes the existence of a judicially remediable right." (cleaned up)).

latter of which is satisfied when a party brings an APA claim against a federal agency or officer thereof.

ACC argues that the Court has mandamus jurisdiction to hear its FACA claims against the Academy.  See Am. Compl. ¶¶ 128–60; ACC Reply & Opp'n at 38–41.  The Academy counters that because it is a private entity, it cannot be subject to a mandamus claim and, therefore, this Court must dismiss for lack of jurisdiction.  NAS Mot. & Opp'n at 8–14.

The Mandamus Act provides that district courts  "have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361 (emphasis added).  Accordingly, courts routinely dismiss mandamus actions brought against private individuals, corporations, and organizations.  See, e.g., González-Vera v. Townley, 83 F. Supp. 3d 306, 314 (D.D.C. 2015) (private debtor); Syngenta Crop Prot., Inc., 655 F. Supp. 2d at 62 (business competitor and arbitration panel); Dantzler v. U.S. Dep't of Just., Civ. A. No. 20-1505 (TNM), 2021 WL 2809125, at *4 (D.D.C. July 6, 2021) (nonprofit membership organization); Sheldon v. James E. Rogers L. Sch., Civ. A. No. 14-1261, 2014 WL 3668278, at *1 (D.D.C. July 24, 2014) (private law school), aff'd mem., 595 Fed. App'x. 1 (D.C. Cir. 2015).

The National Academy of Sciences is a "federally chartered corporation." 36 U.S.C. § 150301. "On request of the United States Government," the Academy "investigate[s], examine[s], experiment[s], and report[s] on any subject of science or art." Id. § 150303.  However, though its charter was granted by Congress and signed by President Lincoln in 1863, the D.C. Circuit has observed that "the Academy is not a governmental agency." Herbert, 974 F.2d at 193 n.1.  Rather, it is a "private, non-governmental, non-profit corporation dedicated to exploring science and its use for the general welfare." Id. at 193 (footnote omitted); see Lombardo v. Handler, 397 F. Supp.

792, 796 (D.D.C. 1975) (holding that the Academy is not an "agency" of the federal government), aff'd, 546 F.2d 1043 (D.C. Cir. 1976) (unpublished table decision).

ACC's amended complaint concedes that the Academy is a "private, nongovernmental institution."  Am. Compl. ¶ 30.  And the Academy has submitted evidence expanding on that point, which ACC does not dispute.  See ACC Reply & Opp'n at 38–41 (not disputing facts asserted in the Academy's submitted declaration).  A declaration from the Academy's chief program officer asserts that the Academy is a "tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code."  Decl. of Gregory H. Symmes [ECF No. 19-2] ¶ 3.  The Academy receives no direct government appropriations and has neither "vested regulatory authority" nor "power to implement its own recommendations."  Id. ¶ 4.  The government does not hold any seats on the Academy's governing board, and the Academy's employees are not employees of the government. Id. ¶ 5.

However, in its briefing, ACC argues that the Academy can nonetheless be sued under the Mandamus Act because it is a "quasi-public" entity.  ACC Reply & Opp'n at 40–41.  The term "quasi-public" emerged in the FACA context as shorthand for the types of organizations whose committees were "utilized" by federal agencies and therefore subject to the procedural requirements of FACA.  Animal Legal Def. Fund, 104 F.3d at 429 (discussing Pub. Citizen, 491 U.S. at 462).  ACC provides no support, nor is the Court aware of any, applying the "quasi-public" concept to subject otherwise private entities to mandamus actions.  Indeed, in a somewhat similar case, a judge in this District refused to apply the Mandamus Act to the Corporation for Public Broadcasting, a private entity which, like the Academy, was created by a federal statute to carry out a public purpose.  See Network Project v. Corp. for Pub. Broad., 398 F. Supp. 1332, 1339 (D.D.C. 1975), aff'd in relevant part, 561 F.2d 963, 976 (D.C. Cir. 1977).  There, the court concluded that the Corporation for Public Broadcasting was not an "agenc[y] of the United States"

and the members of the CPB's board were not "officers of the United States" who could be sued under the mandamus statute.  Id.  The same is true here.

In any event, Animal Legal Defense Fund provides at most very weak support for ACC's position that the Academy is even "quasi-public," since, as discussed above, Congress expressly overruled its holding that the Academy's committees were federal advisory committees.  See 5 U.S.C. §§ 1001, 1014; 143 Cong. Rec. H10579 (Nov. 9, 1997) (statement of Rep. Horn) (explaining Congress's purpose of overruling Animal Legal Defense Fund and exempting Academy committees from the full requirements of FACA).

ACC further claims that this Court should find mandamus jurisdiction over the Academy because otherwise, there would be no way to enforce the procedural rights guaranteed by Section 15.  ACC Reply & Opp'n at 39–40.  This argument confuses a necessary requirement of mandamus jurisdiction with a sufficient one.  While the lack of an adequate, alternative remedy is one element of a Mandamus Act claim, it does not alone create jurisdiction.  See Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 189 (D.C. Cir. 2016).  To establish mandamus jurisdiction, a plaintiff must also demonstrate "a clear and indisputable right to relief" and a "clear duty to act" by the government agency or official.  Id.; cf. Alexander v. Sandoval, 532 U.S. 275, 286–87 (2001) ("Without [legislative intent], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.").  Here, the statute is crystal clear: the Court only has mandamus jurisdiction over federal "officers," "employees," and "agencies of the United States."  The Academy is not any of these.[2]

---

[2] That this Court did not question the availability of mandamus relief against a federal advisory committee, which included among its members some state and local officials, in Legal Defense Fund, 496 F. Supp. 3d at 141 n.8, does not suggest that mandamus relief is available against the Academy.  See ACC Reply & Opp'n at 38–39.  The President's Commission on Law Enforcement was fundamentally different from the formaldehyde committee because it was a "federal advisory committee," which, by definition, is "established or utilized" by a federal agency and must be subject to the "control and supervision" of an agency official.  Legal Def. Fund, 496 F. Supp. 3d at 143; see 5 U.S.C. §§ 1001, 1007.  In that case, the Commission included several federal officers, such as the chair and vice-chair, who were Department of Justice officials and were sued in their official capacities.  Id. at 144–45; see Compl. ¶¶ 13–

Hence, ACC has not raised a plausible claim that mandamus relief is available against the Academy.  Accordingly, the Court will dismiss ACC's claims against the Academy for lack of subject matter jurisdiction and deny ACC's motion for a preliminary injunction against the Academy as moot.

## II.   EPA's Rule 12(b)(1) Motion

EPA asserts that this Court lacks jurisdiction over the claims against it because ACC does not meet the "irreducible constitutional minimum of standing."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  Standing has three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. at 560–61 (cleaned up).

"[W]hen considering whether a plaintiff has Article III standing, a federal court must assume, arguendo, the merits of his or her legal claim."  Est. of Boyland v. U.S. Dep't of Agric., 913 F.3d 117, 123 (D.C. Cir. 2019) (quoting Parker v. District of Columbia, 478 F.3d 370, 377 (D.C. Cir. 2007)).  However, each element of standing must be "supported in the same way as any other matter on which the plaintiff bears the burden of proof."  Bennett v. Spear, 520 U.S. 154, 167–68 (1997) (quoting Lujan, 504 U.S. at 561).  "The question at this early juncture in the litigation is whether plaintiffs have plausibly alleged standing."  In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig., 928 F.3d 42, 54 (D.C. Cir. 2019).

---

14, 46, Legal Def. Fund, Civ. A. No. 20-1132 (JDB), ECF No. 1.  By contrast, here, ACC has attempted to sue the Academy, a private organization that convened a committee with no federal members.  See 5 U.S.C. § 1014.

"[S]tanding is not dispensed in gross; rather plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." TransUnion LLC v. Ramirez, 141 S.Ct. 2190, 2208 (2021).  Where, as here, a plaintiff "seeks prospective declaratory and injunctive relief, [the plaintiff] must establish an ongoing or future injury that is 'certainly impending.'" Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013)).

Having concluded that the claims against the Academy must be dismissed, the Court must consider which of ACC's claims remain as to EPA and what relief is sought thereunder.  The amended complaint plainly includes a claim for relief under the APA, charging that EPA is engaged in "arbitrary and capricious" action by relying on an Academy report produced in violation of FACA.  Am. Compl. ¶¶ 161–68.

The more ambiguous question is whether the Court should construe ACC's claims under the Mandamus Act to apply against EPA once the Academy has been dismissed as a defendant. These claims are clearly pleaded against the Academy: ACC specifically accuses the Academy of violating FACA and seeks an injunction directing the Academy to comply with FACA.  Am. Compl. ¶¶ 132, 139, 145, 151, 155, 160.  However, while each mandamus count refers to the fact that the committee was created "under an agreement with EPA," see id. ¶¶ 130, 136, 143, 148, 153, 158, the claims for relief do not directly suggest that ACC also intended to hold EPA liable for each alleged FACA violation (e.g., "failure to provide opportunity for public comment" and "failure to exercise independent judgment").  That said, ACC's general theory of the case— apparent from the amended complaint—is that EPA "managed or controlled" the formaldehyde committee to obtain a rubber stamp on its draft formaldehyde assessment.  See, e.g., Am. Compl. ¶ 164 ("EPA effectively selected Committee members and controlled the activities and reports of the Committee.").  Further, in briefing and at oral argument, ACC indicated that it seeks to hold

EPA liable for the committee's allegedly unlawful actions, noting that "it is the agency that calls for NAS's review of its work product in the first place." ACC Reply & Opp'n at 34. Hence, even though the amended complaint is not clear on this point and the briefing is cursory, the Court will give ACC the benefit of the doubt and also consider whether it has standing to bring claims against EPA under the Mandamus Act challenging the committee's alleged FACA violations.

### A.  Informational or Representational Standing

The classic form of injury in a FACA case is "informational" or "representational." Essentially, the plaintiff—whether an individual or an organization—states a cognizable injury when denied access to public information guaranteed by the statute, or when denied an opportunity to seek representation of its interests on the committee. As the Supreme Court recognized in Public Citizen, the denial of "access to [a committee's] meetings and records in order to monitor its workings and participate more effectively in the [process]" is a cognizable injury. 491 U.S. at 449. "As when an agency denies requests for information under the Freedom of Information Act, refusal to permit appellants to scrutinize the [a committee's] activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue." Id. Here, ACC has adequately pleaded informational injury. For example, ACC alleges that "brief summar[ies]" the Academy provided from closed formaldehyde committee meetings did not satisfy the statutory requirements, and that written materials supplied to the committee from third parties were not publicly disclosed as required by statute. See Am. Compl. ¶¶ 85–92.

This Court has also recognized that the denial of representation or of the opportunity to obtain representation on an advisory committee is a cognizable injury. Legal Def. Fund, 496 F. Supp. 3d at 128–29 (citing, inter alia, Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv. Sector Surv. on Cost Control, 711 F.2d 1071, 1074 n.2 (D.C. Cir. 1983) (stating, in dictum, that persons having a direct interest in the committee's purpose have sufficient injury-in-fact to sue

over lack of committee representation); and Nat. Res. Def. Council v. Dep't of Interior, 410 F. Supp. 3d 582, 601–02 (S.D.N.Y. 2019) (noting that "the weight of the caselaw" indicates that "if a party with a direct interest in the committee's work" is "denied access" to membership, then "that party has standing to challenge the denial")).  In Legal Defense Fund, this Court concluded that the organizational plaintiff pleaded an injury-in-fact where it had "an interest in" and was directly affected by the challenged committee's study of policing but was denied a representative voice on the committee.  496 F. Supp. 3d at 128.

This case is factually indistinguishable from Legal Defense Fund in this respect, as ACC and its members plainly have an interest in formaldehyde, and the committee's peer review of a report essential to EPA's further regulation of that substance.  See Am. Compl. ¶¶ 14–15, 23.  Further, ACC sought to obtain representation of its interests on the committee, which was denied.  See id. ¶¶ 17, 65–66.  Hence, accepting ACC's legal theories, ACC has demonstrated informational and representational injury sufficient to satisfy Count I (failure to fairly balance committee's membership), Count II (failure to disclose committee members' conflicts of interest); Count III (failure to provide biographies of committee members); Count IV (failure to publicly disclose materials and meeting summaries), and Count V (failure to provide opportunity for public comment on committee appointments).

EPA does not contest that ACC has suffered an injury in fact.  EPA Mot. & Opp'n at 14.  Rather, EPA claims that any such injuries are not "traceable to Federal Defendants" but rather to the Academy, who convened and operated the committee.  Id. at 14–15.  EPA points out that the amended complaint generally blames the Academy for violating FACA in various ways.  See Am. Compl. ¶¶ 56–59 (accusing the Academy of a "fail[ure] to develop a fairly balanced Committee," "lack of transparency" about conflicts of interest, and "with[olding of] . . . key information about Committee members").  EPA further notes that the Task Order charged the Committee with

conducting an "independent external review process."  EPA Mot. & Opp'n at 15 (quoting Task Order at 3).  "Because the committee performed the peer review under the auspices of NAS—not EPA—any informational injury is not traceable to EPA."  Id.

ACC's primary counterargument is that other courts have held agencies liable for the FACA violations of committees convened by private entities at the agency's request.  ACC Reply & Opp'n at 34.  This argument misses the mark.  Those cases concern federal advisory committees under the general FACA provisions, not Academy committees under Section 15.  A federal advisory committee, unlike an Academy committee, must file a federal charter, 5 U.S.C. § 1008(c), and the agency is responsible for appointing an officer to ensure compliance with FACA, see id. §§ 1007, 1009.  Where a plaintiff plausibly alleges that a committee advising the government is a statutory "advisory committee," it follows that the agency is responsible when a committee fails to disclose information or to ensure the committee is balanced.  In those cases, assuming the truth of plaintiff's allegations, the agency "is subject to an array of FACA obligations concerning the [committee] that are entirely within its power to discharge."  Jud. Watch, Inc. v. U.S. Dep't of Com., 583 F.3d 871, 873 (D.C. Cir. 2009); see also Pub. Citizen, 491 U.S. at 449 (concluding plaintiff had standing to "attempt[] to compel the Justice Department and the ABA Committee to comply with FACA's charter and notice requirements").

Those precedents are inapplicable here because EPA had no duty under FACA to file a charter or to monitor the appointments and operations of the formaldehyde committee.  To the contrary, EPA had a legal duty to stay out of the way.  In a clear contrast to the statutory provisions relating to federal advisory committees, the statute applicable to Academy committees—Section 15—prohibits the sponsoring agency from exercising "any actual management or control" over the committee.  5 U.S.C. § 1014(a)(1).  Further, all the informational and representational-type requirements rest with the Academy.  See, e.g., id. § 1014(b)(1) ("The Academy shall determine

and provide public notice of the names and brief biographies of individuals that the Academy appoints or intends to appoint to serve on the committee."); id. § 1014(b)(2) ("The Academy shall determine and provide public notice of committee meetings that will be open to the public."). Hence, because ACC brings its claim pursuant to Section 15, the Court may not automatically attribute a plausibly alleged informational or representational injury to the agency as it could when the standard provisions of the FACA are at issue.  Such injuries are not per se attributable to EPA.

Instead, the Court must consider whether ACC has plausibly alleged that its informational and representational injuries are traceable to and redressable by EPA.  "When 'causation and redressability . . . hinge on the response of the regulated (or regulable) third party to the government action or inaction,' standing is 'substantially more difficult to establish.'"  Waterkeeper All., Inc. v. Regan, 41 F.4th 654, 660 (D.C. Cir. 2022) (quoting Lujan, 504 U.S. at 562).  In such cases, "the burden [is on] the plaintiff to adduce facts showing that [the third party's] choices have been or will be made in such manner as to produce causation and permit redressability of injury."  Marino v. Nat'l Oceanic & Atmospheric Admin., 33 F.4th 593, 598 (D.C. Cir. 2022) (quoting Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 938 (D.C. Cir. 2004)).  "[A]t the pleading stage . . . [courts] require[] that the facts alleged be sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought."  Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs., 489 F.3d 1267, 1275 (D.C. Cir. 2007).

ACC has not plausibly alleged that EPA's actions caused the Academy to limit public disclosure and restrict the composition of the committee.  To begin, ACC does not establish traceability based on the bare fact that the committee was formed pursuant to a contract with EPA. See ACC Reply & Opp'n at 34.  Particularly where the Academy is subject to a statutory obligation to act independently of the agency, the Academy's mere agreement with the agency does not itself

raise a plausible claim that EPA controlled the Academy or its formaldehyde committee.  See Am. Compl. ¶ 48 (acknowledging that the contract "required [the Academy] to form a committee . . . in accordance with all applicable laws and government contracting standards").  After all, there will always be some type of agreement initiating the Academy's work.

Nor does plaintiff's allegation that the contract limited the scope of the review suggest that EPA was a cause of the alleged informational or representational injury.  See Am. Compl. ¶ 95. Indeed, any suggestion that the Task Order limited the fair balance of the committee is plainly contradicted by ACC's allegation that the Task Order "specifically recommended" that the Academy appoint members with "expertise in occupational epidemiology; biological modeling including mechanisms of carcinogenicity; physiologically-based pharmacokinetic ('PBPK') modeling; hematology; and reproductive and developmental toxicity"—the areas of expertise that ACC claims were inappropriately left out.  Id. ¶ 62.  True, the Task Order limits public meetings to eight hours, see ACC Mot. at 7 (citing Task Order at 3), but this provision is ultimately not enough to raise a plausible claim that EPA is liable for the alleged general failures to comply with Section 15 of FACA.

ACC also fails to plausibly allege that EPA directly or indirectly caused its informational and representational injuries by "manag[ing] or control[ling]" the Academy or the committee.  See ACC Reply & Opp'n at 4–10;[3] cf. Byrd v. EPA, 174 F.3d 239, 243 (D.C. Cir. 1999) (recognizing that EPA "caused" a plaintiff's informational injury by "denying [him] timely access to" a privately organized committee's materials).  As far as direct control goes, ACC alleges that, upon the request of the Academy, a single EPA staffer suggested names of potential peer reviewers to participate in the committee and encouraged the Academy to rely on individuals who had served

---

[3] ACC's central arguments about "management or control" are made with respect to the merits of this case. However, in view of ACC's sparse briefing on these points, and because those same factual allegations are relevant to the question of EPA's vicarious liability for purposes of standing, the Court considers them here.

on prior EPA committees.  Id. ¶¶ 98–100.  But it remains speculative that the Academy was pressured to appoint committee members recommended by EPA.

ACC's allegations of indirect control fare no better.  ACC claims that EPA had inappropriate influence on the committee through its connections with the study director, who worked on an earlier version of the formaldehyde report at EPA.  Am. Compl. ¶¶ 106–07; see ACC Mot. at 35–37.  However, ACC can point only to the one factual allegation—that the study director sought nominations for committee members from EPA—to support its contention as to inappropriate influence.  ACC's theory amounts to little more than speculation that the study director was so beholden to EPA as to seek appointment of an unbalanced and biased committee and to prevent the public from fully participating in its proceedings.  That is not enough.

ACC also suggests that committee members who presently or previously served on EPA advisory committees and received EPA grants would have continued allegiance to the agency, which might amount to some level of indirect control.  See ACC Mot. at 26.  However, any bias among committee members logically could not have caused ACC's representational injuries since those individuals did not select the committee.  Further, it is only speculation that those members would be so loyal to the agency as to limit the public's knowledge about the committee's information.  True, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice,"  Osborn v. Visa Inc., 797 F.3d 1057, 1063 (D.C. Cir. 2015) (alteration in original) (quoting Lujan, 504 U.S. at 561), but ACC has failed to plausibly allege that the claimed informational and representational injuries it suffered were traceable to the actions of EPA.

The Sixth Circuit recently rejected a similar argument albeit based on different facts.  In Tuurani v. Wray, 988 F.3d 313 (6th Cir. 2021), a putative gun purchaser sued the FBI director after a gun dealer refused to sell him a firearm.  Id. at 315.  The gun purchaser blamed the FBI

because a federal agent had visited the dealer and expressed concerns "with the company [plaintiff] keeps." Id. at 316.  The court held that the purchaser failed to meet the traceability element of standing because he had not alleged that the agent's actions had a "determinative or coercive effect" upon the dealer.  Id. (quoting Bennett, 520 U.S. at 169).  Here, as in Tuurani, the facts alleged do not give rise to any reasonable inference that EPA "command[ed] or coerce[d]" the Academy's appointments or alleged failures to comply with public disclosure obligations.  Id. at 317.  Hence, the Court concludes that ACC has not plausibly alleged informational or representational injury as to EPA because it has not shown any purported injuries were traceable to the agency.

### B.  Organizational Standing

ACC also claims that it has standing under a theory of organizational harm.  An organization may demonstrate standing when it suffers a "concrete and demonstrable injury to [the] organization's activities—with the consequent drain on the organization's resources." People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. ("PETA"), 797 F.3d 1087, 1093 (D.C. Cir. 2015).  The key issue is whether "the organization's tasks [have been] impeded." Commissioned Officers Ass'n of U.S. Pub. Health Serv. v. Bunch, Civ. A. No. 21-853 (JDB), 2022 WL 951271, at *5 (D.D.C. Mar. 30, 2022) (quoting Ctr. for Responsible Sci. v. Gottlieb, 346 F. Supp. 3d 29, 37 (D.D.C. 2018), aff'd, 809 F. App'x 10 (D.C. Cir. 2020)).  For example, an organization clearly satisfies the injury requirement when the challenged conduct frustrates the organization's ability to provide services to its members.  See Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982); see also, e.g., Action All. of Senior Citizens of Greater Phila. v. Heckler, 789 F.2d 931, 937–38 (D.C. Cir. 1986) (concluding that plaintiff properly pleaded standing where "the challenged regulations deny the AASC organizations access to information and avenues of redress they wish to use in their routine information-dispensing, counseling, and referral

activities"); Nw. Immigrant Rts. Proj. v. U.S. Citizenship and Immigr. Servs., 496 F. Supp. 3d 31, 46–48 (D.D.C. 2020) (concluding that agency rule would "impose new burdens and costs" and "make it more difficult" for plaintiff organizations to assist individuals with immigration benefits).

The D.C. Circuit has recognized two important limitations on organizational standing. First, an organization must be able to show a "direct conflict between the defendant's conduct and the organization's mission." Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc. ("ASPCA"), 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).  "If a defendant's conduct does not conflict directly with an organization's stated goals, it is entirely speculative whether the defendant's conduct is impeding the organization's activities."  Nat'l Treasury Emps. Union, 101 F.3d at 1430.  Second, an organization does not satisfy the injury-in-fact requirement when it has simply "diver[ted] resources to litigation or to investigation in anticipation of litigation . . . a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing."  ASPCA, 659 F.3d at 25.

In National Ass'n of Home Builders v. EPA ("NAHB"), 667 F.3d 6 (D.C. Cir. 2011), the D.C. Circuit concluded that an organization did not satisfy the injury-in-fact requirement when it "'spent considerable staff time and monetary resources in the quest to clarify [Clean Water Act] jurisdiction,' such as submitting comments to the EPA and to the [U.S. Army Corps of Engineers], testifying before the United States Senate and participating in 'numerous court cases,' including this one."  Id. at 12.  That conduct is materially indistinguishable from the diversion of resources alleged here: funding studies for inclusion in the committee's review, drafting letters to EPA and the Academy about the review process and alleged FACA violations, and filing FOIA requests with EPA to obtain information concerning the committee.  Am. Compl. ¶¶ 20–21, 46–47; see ACC Mot. at 16.  Here, as in NAHB, plaintiff's injuries arise entirely from its efforts to advocate on the very issue now before the Court; its injuries were incurred as a prelude to this lawsuit.

Because the agency's actions merely "caused [ACC] to spend money trying to convince the [EPA] to modify that very same [action]," ACC has failed to state an actionable injury.  Int'l Acad. of Oral Med. & Toxicology v. U.S. Food & Drug Admin., 195 F. Supp. 3d 243, 257 (D.D.C. 2016) (holding that organization's diversion of resources to produce studies intended to challenge the agency's purported errors and to "participate in a scientific-advisory-panel meeting" did not satisfy injury requirement).

ACC responds that because its communications were not solely about the appropriate risk level of formaldehyde, but also "to inform NAS and EPA of their FACA violations, and request[] that they address those procedural violations," the D.C. Circuit's precedents on litigation-related activities and "issue-advocacy" are inapplicable.  ACC Reply & Opp'n at 37.  Not so.  ACC's efforts to persuade EPA to comply with FACA are themselves a form of issue advocacy.  Indeed, they were intended to influence the subject of this very lawsuit.  That some of their advocacy does not pertain to the substance of the formaldehyde report itself is beside the point.[4]

The Court pauses to observe that reaching the opposite conclusion would undermine the standing requirement itself.   As another judge in this district has explained, "injuries to an organization's government lobbying and issue advocacy programs cannot be used to manufacture

_____

[4] The D.C. Circuit has recognized standing in certain cases where a defendant's actions impose "'operational costs beyond those normally expended' to carry out its advocacy mission."  NAHB, 667 F.3d at 12 (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1434 (D.C. Cir. 1995)); see PETA, 797 F.3d at 1094 (concluding that animal welfare organization had standing when an agency's refusal to apply certain regulations "perceptibly impaired" the organization's efforts to bring regulatory violations to its attention).  However, those cases are fundamentally different from this one because the advocacy impeded was distinct from the advocacy implicated in the lawsuit.  Take, for example, the PETA case.  There, the animal welfare organization challenged USDA's failure to apply statutory general welfare requirements to birds.  797 F.3d at 1089–91.  Because USDA did not do so, PETA was unable to file ordinary complaints with USDA seeking redress for mistreatment of birds.  Id. at 1091.  Similarly, in Scenic Am., Inc. v. U.S. Dep't of Transp., 983 F. Supp. 2d 170 (D.D.C. 2013)—a case on which ACC also relies— the court concluded that an organization had standing to challenge a federal guidance document that allegedly contributed to the proliferation of digital billboards because the organization needed to use substantial resources to help its members "participat[e] in local zoning board meetings to challenge specific billboards" and "educat[e] local communities about the legal, policy, safety, and administrative issues related to the different signs" as a result of the agency's decision.  Id. at 178–79.  In those cases—unlike here—the agency's actions limited the organization's ability to carry out its advocacy purpose in some way beyond the matter at issue in the litigation itself.

standing, because that would allow lobbyists on either side of virtually any issue to take the Government to court." Env't Working Grp. v. U.S. Food & Drug Admin., 301 F. Supp. 3d 165, 172 (D.D.C. 2018).   At the end of any organization's pre-litigation advocacy campaign, it could claim that the expenditures incurred leading up to the lawsuit were so injurious as to confer standing.  This would eviscerate the standing requirement in many procedural APA cases, for an organization could often claim that it challenged not only the substance of the agency's action, but also the failure to comply with the requirements of the APA itself.  That is obviously insufficient to confer standing, as are ACC's purported organizational injuries here.

### C. Associational Standing

Finally, ACC claims that it has standing to sue on behalf of its individual members.  An organization has associational standing where (1) at least one member has standing to sue in their own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim nor relief depends on the participation of individual members in the suit.  Sierra Club v. EPA, 292 F.3d 895, 898 (D.C. Cir. 2002).  Principally at issue here is whether "at least one member" of ACC has "standing to sue in [their] own right."  Id.  ACC has asserted two different theories of standing premised on two different theories of harm: direct and reputational. The Court will consider each theory in turn.

### i. Direct Harm to Members

ACC alleges that its members "face imminent further injury from EPA'[s] reliance on the Report to, inter alia, set an IRIS value for formaldehyde that is not based on sound science."  ACC Mot. at 17; see Am. Compl. ¶ 22.  Standing may be maintained based on "threatened injury," but only when such injury "is certainly impending," Clapper, 568 U.S. at 401, or at "substantial risk" of occurrence, Jibril v. Mayorkas, 20 F.4th 804, 814 (D.C. Cir. 2021) (quoting New Jersey v. EPA, 989 F.3d 1038, 1047 (D.C. Cir. 2021)).

The D.C. Circuit has been skeptical of standing theories premised on adverse regulatory action that may occur in part due to an advisory committee's recommendation.  In <u>R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.</u>, 810 F.3d 827 (D.C. Cir. 2016), tobacco companies sued FDA claiming that members of an allegedly biased advisory committee had unlawful conflicts of interest.  <u>Id.</u> at 828.  The D.C. Circuit held that the risk of future, adverse FDA action taken on the basis of biased committee recommendations was "insufficiently imminent" to confer standing because it "remain[ed] unclear whether the FDA [would] issue a final rule, and what it would say."  <u>Id.</u> at 829–30.  The court highlighted the remaining intermediate steps before any rule would issue, including the consideration of public comments and statutory standards.  <u>Id.</u> at 830; <u>see</u> <u>Fertilizer Inst. v. EPA</u>, 938 F. Supp. 52, 55 (D.D.C. 1996) (concluding that plaintiff lacked standing to challenge a putative advisory committee's proposed hazard values for certain chemical substances that the agency had not yet adopted in rulemaking); <u>see also</u> <u>Metcalf v. Nat'l Petrol. Council</u>, 553 F.2d 176, 186–88 (D.C. Cir. 1977) (rejecting as too "speculative and conjectural" plaintiff's "claim to have been injured on the theory that the challenged structure of the [committee] causes it to make certain biased recommendations, which in turn cause government agencies to adopt policies favoring the petroleum industry, which in turn cause the appellants to be injured as consumers and citizens").

ACC's theory (as identified most clearly in support of its motion for a preliminary injunction) is as follows:

> 1.  "EPA will immediately use the Report—the fruit of an unlawful process—to modify and then finalize the IRIS Assessment . . . 'on an expedited time frame.'" ACC Mot. at 38–39.
>
> 2.  "EPA will then use the IRIS Assessment in ways that directly impact ACC and its members, including as a basis for regulation" under the Toxic Substances Control Act and the Federal Insecticide Fungicide and Rodenticide Act.  <u>Id.</u> at 40.
>
> 3.  EPA will give the IRIS value "regulatory preference over other values."  <u>Id.</u> at 41.

4. "If [EPA] does so, it will determine that formaldehyde constitutes an 'unreasonable risk' across many 'conditions of use' critical to ACC's members, resulting in onerous regulations." Id.

5. "EPA's use of IRIS values consistent with the Assessment thus will cause substantial and irreparable harm to the businesses of ACC's members who produce and use formaldehyde." Id.

At oral argument, counsel for EPA conceded that the agency has already begun "using" the report to revise the draft formaldehyde assessment. However, EPA maintains that ACC still does not face any "certainly impending" harm from EPA's "use" of the report. The Court agrees.

ACC's theory of harm depends on EPA's adoption of an allegedly too-low IRIS value; the implementation of regulations on the basis of that value; and resulting harm to members' businesses. Yet, EPA has not finally decided the hazard values it will adopt for formaldehyde. As EPA points out, peer review was only Step 4(b) of a seven-step process. EPA Mot. & Opp'n at 6; see ACC Reply & Opp'n at 24; see also Am. Compl. ¶ 23. Significantly, the assessment still must be "reviewed by EPA's program offices and other federal agencies, including the Executive Office of the President." EPA Mot. & Opp'n at 6. Even once finalized, the IRIS value itself is unlikely to inflict concrete harm on the companies—as the D.C. Circuit has observed, the IRIS "database by itself has no preclusive effect; the data in the database constrain no one until so applied in a particular rule." Chem. Mfrs. Ass'n v. EPA, 28 F.3d 1259, 1263 (D.C. Cir. 1994).

Further, it remains uncertain what regulations EPA may premise on that IRIS value. Although EPA has indicated its intent to issue regulations on the basis of the formaldehyde IRIS value, see Am. Compl. ¶ 23, there is no guarantee such regulations will reach a final, enforceable form. After all, such regulations must themselves go through notice-and-comment, at which time ACC and its members could provide their input on the value (as they have done in the past). See Reconsideration of the 2020 National Emission Standards for Hazardous Air Pollutants, 87 Fed. Reg. 77985, 77990 (Dec. 21, 2022) (considering ACC's petition for reconsideration of regulation

premised on IRIS value).  And even if ACC's regulatory advocacy fails, ACC would likely be able to challenge the adopted regulations pre-enforcement, and certainly if ACC's members were subject to regulatory action.  See Chem. Mfrs. Ass'n, 28 F.3d at 1267 (deciding legal challenge to regulations premised on IRIS values).  At that time—when and if ACC's members face a concrete injury—they could raise the issue whether the regulation was itself arbitrary and capricious based on the agency's reliance on a peer review process (allegedly) conducted in violation of law.  With so many stops in between, the Court cannot conclude that ACC faces "certainly impending" harm. See Clapper, 568 U.S. at 409.[5]

The Court recognizes that this case is somewhat distinguishable from R.J. Reynolds and Metcalf because the causal connection between EPA's acceptance of the formaldehyde report and issuance of regulations in accordance with its assigned hazard values is closer.  ACC has alleged that EPA is finalizing the IRIS assessment and has made statements indicating it will move forward quickly, relying on this value as a basis for industry regulation.  Am. Compl. ¶ 23.  And, further, ACC has provided some support for the allegation that, once adopted, EPA is likely to treat the IRIS values as presumptively correct.  See id. & n.14 (citing 87 Fed. Reg. at 77990 (describing IRIS values as the "preferred source of chronic dose-response data" for Clean Air Act regulation and rejecting ACC's later efforts to impugn them without new information)).  However, ACC has not identified any regulation or statute requiring EPA to rely on IRIS values or to give the value a "determinative or coercive effect."  Cf. Bennett, 520 U.S. at 169 (concluding that agency action was traceable to a biological opinion where a federal agency that chose to deviate from such

---

[5] The D.C. Circuit has observed that such theories of harm may also suffer traceability defects.  Nat. Res. Def. Council  v. Pena, 147 F.3d 1012, 1026 n.8 (D.C. Cir. 1998) ("If a report produced in violation of FACA cannot be acted on by the agency without first undertaking a rulemaking or adjudication, the plaintiff may have difficulty showing the FACA violation is responsible for a concrete injury it has sustained or will sustain based on the administrative decisionmaking process."); cf. Clapper, 568 U.S. at 410–11 (noting that when a plaintiff's alleged harm "relies on a highly attenuated chain of possibilities" it raises a question whether the harm "satisf[ies] the requirement that any injury in fact must be fairly traceable" to the challenged conduct).

opinion "[bore] the burden of articulating in its administrative record its reasons for disagreeing with the conclusions of [the] biological opinions" under penalty of criminal prosecution (cleaned up)).  Rather, as explained above, the adverse regulation is not certain, and ACC's members will have future opportunity to challenge such regulations if and when they are promulgated. Accordingly, it appears that no harm is "certainly impending" as a result of EPA's use of the formaldehyde report, and ACC lacks standing to challenge it on this basis.[6]

### ii.        Reputational Harm to Members

Finally, ACC argues that its members are already experiencing reputational harm due to EPA's use of the formaldehyde report.  Specifically, ACC argues that the report causes harm by suggesting that there has been an official determination that formaldehyde causes cancer. Determinations like this one, per ACC, can have "significant impacts because they can trigger litigation, state regulation, and market distortions. . . . [T]he stigma of a hazard determination, once imposed, is difficult to erase even if the technology or substance is completely exonerated through additional research."  Declaration of Robert Simon on Behalf of ACC [ECF No. 17-4] ("ACC Decl.") ¶ 27 (internal quotation marks omitted).  ACC further claims that EPA's "use[] [of] the Report to officially and publicly change the status of the IRIS assessment of formaldehyde" from Step 4 to Step 5 "conveys to the public (incorrectly) that the Assessment is in near-final form and can be relied upon, because it has undergone peer review."  ACC Reply & Opp'n at 24.

The D.C. Circuit has recognized that reputational injury can provide a basis for standing. McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S., 264 F.3d 52, 57 (D.C. Cir. 2001).  Reputational harm generally gives rise to a cognizable injury in two

---

[6] The Court does not intend to suggest that threatened action resulting from a FACA report could never satisfy the requirements of standing.  See Pena, 147 F.3d at 1024 (suggesting that a plaintiff who lived near a proposed nuclear facility might have standing where he or she alleged that a committee report would be used by the agency to support construction or operation of the facility which, in turn, would expose the plaintiff to emissions of hazardous substances).

situations: "The first is when the harm causes a 'loss of clients or other business' — i.e., economic injury.  The second situation involves an individual whose reputation is damaged as a result of public stigmatization."  Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec., Civ. A. No. 18-2115 (JEB), 2019 WL 689987, *4 (D.D.C. Feb. 19, 2019) (citation omitted).  "As profit-based enterprises, [ACC's members] presumably mean economic harm to their businesses, rather than stigmatic harms."  Id.

The Court concludes that ACC's members have not sufficiently alleged "concrete and particularized" economic harms to satisfy the injury-in-fact requirement.  Neither ACC nor its members allege that any purchaser has even threatened to withdraw a business contract or quit using formaldehyde, or that the companies' stock prices or valuations have been affected in any way.  See Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv., Civ. A. No. 15-CV-2047 (DLF), 2020 WL 1984256, at *5 (D.D.C. Apr. 27, 2020) (concluding plaintiff's alleged reputational harms were "too vague and unsubstantiated" to survive motion to dismiss).  At most, ACC has pointed to statements of certain policy makers citing the formaldehyde report as authoritative.  See ACC Reply & Opp'n at 23 nn.32–34.  But there remains a wide gap between such statements and any specific, ongoing, or impending economic harm to the business.  The cases ACC cites in support of its related claim that reputational harm satisfies the preliminary injunction requirement of imminent irreparable injury are readily distinguishable because in those cases, the business owners were faced with specific, identifiable, and demonstrable harms.  See Everglades Harvesting & Hauling, Inc. v. Scalia, 427 F. Supp. 3d 101, 115–16 (D.D.C. 2019) (granting preliminary injunction where a "small family company" alleged it was unlikely to survive the growing season without court order);  Beacon Assocs., Inc. v. Apprio, Inc., 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (granting preliminary injunction where firm alleged it would be disadvantaged in a specific

set of government contract opportunities for which it intended to compete).  Here, ACC offers only speculation about what might happen to its members' businesses in the future.

Even assuming that ACC's members have suffered reputational injury as a result of the Academy's report, they have not plausibly alleged that such injury is traceable to EPA's use of the report.  ACC claims that EPA has "relied on the Report to represent to the public that the Assessment's findings have NAS's imprimatur, and the Assessment need only be edited for improved clarity."  ACC Reply & Opp'n at 24.  However, the press release ACC cites does not say this.  See id. at 24 & n.37 (citing EPA, National Academies of Sciences, Engineering, and Medicine Releases Peer Review Report of Draft IRIS Formaldehyde Assessment ("EPA Press Release") (Aug. 9, 2023), https://www.epa.gov/newsreleases/national-academies-sciences-engineering-and-medicine-releases-peer-review-report-draft [https://perma.cc/3XC4-FCR6]). The press release merely repeats the Academy's conclusion that the draft assessment "follows the advice of prior National Academies reports and that its findings on hazard and quantitative risk are supported by the evidence identified," and announces EPA's intention to "evaluat[e]" and "assess[] the recommendations" and revise the draft formaldehyde assessment prior to finalization. EPA Press Release; cf. Advanced Mgmt. Tech., Inc. v. Fed. Aviation Admin., 211 F.3d 633, 636 (D.C. Cir. 2000) (concluding plaintiff could not establish reputational standing based on "vast exaggeration" of the agency's findings).  If anything, this press release suggests that the report is not determinative, but only one part of EPA's assessment.  More fundamentally, formaldehyde has been listed as a "probable human carcinogen" since 1989.  NAS Rep. at 1; see Rtskhiladze v. Mueller, Civ. A. No. 20-1591 (CRC), 2021 WL 3912157, *8–10 (D.D.C. Sept. 1, 2021) (considering multiple causes of plaintiff's reputational injury).  That fact undercuts any claim of reputational injury from the Academy's report.

For these reasons, ACC has failed to show that the purported reputational injury "derives directly from an unexpired and unretracted government action."  <u>Foretich v. United States</u>, 351 F.3d 1198, 1213 (D.C. Cir. 2003).  ACC, therefore, lacks representational standing both because its alleged reputational injuries are not sufficiently concrete and because ACC has failed to demonstrate its injuries are traceable to actions of EPA.

## <u>Conclusion</u>

Having concluded that the Court lacks jurisdiction to consider ACC's claims against the Academy or EPA, the Court must dismiss the case without reaching the merits.  The Court appreciates that the result—ACC can neither sue the Academy nor EPA—might be read to suggest that violations of Section 15 are not redressable here.  Not so.  ACC could challenge future agency regulatory action as "arbitrary and capricious" if EPA relies on the Academy committee's report allegedly produced in violation of Section 15.[7]

In accordance with this Memorandum Opinion, the Court will grant the Academy's and EPA's motions to dismiss and deny ACC's motion for preliminary injunction as moot.  An Order will issue contemporaneously.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: <u>March 15, 2024</u>

---

[7] Another plaintiff, in a different case, may also be able to demonstrate that an agency controlled an Academy committee so thoroughly that the Academy's FACA violations could be attributed to the agency.  Although ACC failed to plausibly allege facts sufficient to sustain that argument here, the Court's reasoning does not foreclose the theory as a matter of law.